# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 15-1054

DAWN GUIDOTTI, on behalf of herself
and all other class members similarly situated,

– v. –

LEGAL HELPERS DEBT RESOLUTION, L.L.C., also known as The Law Firm of
Macey, Aleman, Hyslip and Searns; ECLIPSE SERVICING INC, formerly known
as Eclipse Financial, Inc.; GLOBAL CLIENT SOLUTIONS, L.L.C.; LEGAL
SERVICES SUPPORT GROUP, L.L.C.; JG DEBT SOLUTIONS, L.L.C.; ROCKY
MOUNTAIN BANK AND TRUST OF COLORADO SPRINGS, COLORADO;
LYNCH FINANCIAL SOLUTIONS, INC., trading as Financial Solutions Legal
Center or Financial Solutions Consumer Center or Financial Solutions Processing
Center; JEM GROUP, INC.;

*(For Continuation of Caption See Next Page)*

---

APPEAL FROM AN ORDER ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY, CAMDEN AT NO. 1:11-CV-01219
THE HONORABLE JEROME B. SIMANDLE, U.S.D.J.

## BRIEF AND APPENDIX VOLUME I OF III (PAGES A1-A42) ON BEHALF OF APPELLANTS GLOBAL CLIENT SOLUTIONS, LLC AND ROCKY MOUNTAIN BANK AND TRUST

SHAJI M. EAPEN, ESQ.
MORGAN MELHUISH ABRUTYN
651 West Mount Pleasant Avenue,
  Suite 200
Livingston, New Jersey 07039
(973) 994-2500

JOHN H. PELZER, ESQ.
GREENSPOON MARDER, P.A.
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, Florida 33301
(954) 527-2469

*Attorneys for Appellants Global Client Solutions, LLC
and Rocky Mountain Bank and Trust*

---

CENTURY MITIGATIONS, L.P.; LEGAL HELPERS, P.C., trading as The Law
Firm of Macey and Aleman; THOMAS G. MACEY; JEFFREY J. ALEMAN;
JASON E. SEARNS; JEFFREY HYSLIP; THOMAS M. NICELY; JOEL
GAVALAS; AMBER N. DUNCAN; HARRY HEDAYA; DOUGLAS L.
MCCLURE; MICHAEL HENDRIX; JOHN DOE(S) 1-1000; JIM DOE(S) 1-1000;
TOM DOE(S) 1-1000, the said names of John Doe(s), Jim Doe(s) and Tom Doe(s)
being fictitious; STEPHEN CHAYA; RELIANT ACCOUNT
MANAGEMENT, L.L.C.,

GLOBAL CLIENT SOLUTIONS, LLC;
ROCKY MOUNTAIN BANK AND TRUST,

*Appellants.*

---

## <u>Corporate Disclosure Statement</u>

**Fed. R. App. P. 26.1 disclosure:**

(1)    The parent corporation of ROCKY MOUNTAIN BANK AND TRUST OF COLORADO SPRINGS, COLORADO, is First Flo Corporation, Florence, Colorado.

(2)    The parent corporation of GLOBAL CLIENT SOLUTIONS, LLC is Global Holdings, LLC.

(3)    No public corporation owns 10% or more of ROCKY MOUNTAIN BANK AND TRUST OF COLORADO SPRINGS, COLORADO's stock.

(4)    No public corporation owns 10% or more of GLOBAL CLIENT SOLUTIONS, LLC's stock

(5)    The Hartford is Global Client Solutions, LLC's insurance carrier and has a financial interest in the outcome of the proceedings.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS ............................................................................i

TABLE OF CITATIONS ........................................................................iv

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.............................................................2

STATEMENT OF THE CASE.................................................................3

STANDARD OF REVIEW ....................................................................11

STATEMENT OF RELATED CASES AND PROCEEDINGS ............11

SUMMARY OF ARGUMENT ..............................................................12

ARGUMENT ..........................................................................................14

I.     THERE IS NO DISPUTE OF MATERIAL FACT THAT
GUIDOTTI AGREED TO ARBITRATE HER CLAIMS
WITH GLOBAL AND RMBT. ........................................14

     A.    Guidotti received the AADS with her SPAA and
her lack of recollection does not create a genuine
issue of material fact. ..............................................16

     B.    Alternatively, the AADS was incorporated by
reference into the SPAA. .........................................22

     C.    Alternatively, Guidotti's conduct and use of her
account after admittedly receiving the AADS binds
her to its terms, including her obligation to
arbitrate her claims.................................................30

II.   THE *ATALESE* RULE DISPROPORTIONATELY IMPACTS ARBITRATION AGREEMENTS AND, SO, IS INCONSISTENT WITH AND PREEMPTED BY THE FEDERAL ARBITRATION ACT. ............................................35

    A.   The NJSC created a right to sue "in court" for all claims where no such right previously existed, resulting in the invalidation of arbitration provisions, but not other contractual provisions. ......................36

    B.   The Third Circuit has definitively held that a "knowing and voluntary" standard is not a generally applicable contract defense and does not apply to the validity of an arbitration agreement. ....................38

    C.   The Third Circuit has definitively held that ambiguities in an arbitration provision should be resolved in favor of arbitration. ...............................................40

    D.   The cases cited in *Atalese* are inapposite to the issue of sufficient waiver-of-rights language. .........................41

III.  THE ARBITRATION CLAUSE IS NOT UNCONSCIONABLE. ....................................................................44

    A.   New Jersey law requires a showing of both procedural and substantive unconscionability before a contract provision can be declared unenforceable. ...........................................................................44

    B.   Alternatively, Global and RMBT'S arbitration provision is not substantively unconscionable so as to warrant non-enforcement. ...................................................46

        1.   A requirement that arbitration take place in a specific state does not render the arbitration agreement unconscionable. .............................................46

2.    Global's right to select the arbitrator does not render the arbitration agreement unconscionable. ...........................................................48

3.    Unconscionable terms may be severed from an otherwise conscionable arbitration provision and Section 5 of the FAA provides for a mechanism to appoint an arbitrator........................50

CONCLUSION ......................................................................53

CERTIFICATE OF ADMISSION TO BAR .........................................54

Certificate of Compliance With Rule 32(a) ...........................................55

22672843.5

# TABLE OF CITATIONS

**Page**

## *Cases*

*Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn,*
    983 A. 2d 604 (N.J. Super. Ct. App. Div. 2009) ...........................................26

*Amelco Window Corp. v. Federal Insurance Company,*
    127 N.J. Super. 342, 317 A. 2d 398 (N.J. Super. Ct. App. Div. 1974) .........27

*Amir v. D'Agostino,*
    744 A.2d 1233 (N.J. Super. Ct. Ch. Div.1998) .............................................42

*Aretz v. Plastikos Inc.,*
    Civ. No. 07-239 Erie, 2009 WL 614812 (W.D.P.A. Mar. 6, 2009) ..............16

*Armendariz v. Foundation Health Psychcare Serv., Inc.,*
    6 P. 3d 699 (Cal. 2000) ................................................................................50

*AT&T Mobility LLC v. Concepcion,*
    131 S. Ct. 1740 (2011)..............................................................35, 38, 48, 49

*Atalese v. U.S. Legal Services Group, L.P.,*
    99 A.3d 306 (N.J. 2014) ................................................................9-12, 35-41

*Blackner v. Continental Air Lines, Inc.,*
    311 N.J. Super. 10, 709 A.2d 258 (N.J. Super. Ct. App. Div. 1998) ...........27

*Bourgeois v. Nordstrom, Inc.,*
    No. CIV.A. 11-2442 KSH, 2012 WL 42917 (D.N.J. Jan. 9, 2012) ..............44

*Choice v. Option One Mortgage Corp.,*
    No. CIV.A. 02-6626, 2003 WL 22097455 (E.D. Pa. May 13, 2003) ...........36

*Christ Hosp. v. Dep't of Health & Senior Servs.,*
    748 A.2d 1156 (N.J. Super. Ct. App. Div.2000) ..........................................42

*Coiro v. Wachovia Bank, N.A.,*
    No. Civ. 11-3587, 2012 WL 628514 (D.N.J. Feb. 27, 2012)........................34

*Coup v. Scottsdale Plaza Resort*, LLC,
    823 F. Supp. 2d 931 (D. Ariz. 2011) ............................................................52

*Davis v. Global Client Solutions, LLC*,
    765 F. Supp. 2d 937 (W.D. Ky. 2011) *("Davis I")*..................................48, 49

*Davis v. Global Client Solutions, LLC*,
    No. 3:10-CV-322-H, 2011 WL 4738547 (W.D. Ky. Oct. 7, 2011)
    *("Davis II")* ...............................................................................................49

*Dawson Corporation v.*
*National Union Fire Insurance Company of Pittsburgh, P.A.,*
    285 N.J. Super. 137, 666 A. 2d 604 (N.J. Super. Ct. App. Div. 1995) .........27

*Days Inn Worldwide, Inc. v. Prudent Lodging of Kalamazoo, LLC,*
    Civ. No. 11-2493, 2011 WL 3329526 (D.N.J 2011).........................25, 26, 28

*Dixon v. Rutgers, the State Univ. of N.J.,*
    541 A.2d 1046 (N.J. 1988) .........................................................................43

*Eagle Fire Protection Corp. v.*
*First Indemnity of America Insurance Company,*
    145 N.J. 345, 678 A.2d 699 (N.J. 1996).......................................................27

*Elevator Co. v. Stafford,*
    111 A. 695 (N.J. Sup. Ct.1920) ...................................................................43

*Fitz v. Islands Mech. Contractor, Inc.,*
    No. CIV. 08-CV-00060, 2010 WL 2384585 (D.V.I. June 9, 2010).............39

*Franklin Twp. Bd. of Educ. v. Quakertown Educ. Ass'n,*
    643 A.2d 34 (N.J. App. Div.1994) ...............................................................42

*Gilmer v. Interstate/Johnson Lane Corp.,*
    500 U.S. 20 (1991).......................................................................................41

*Gras v. Associates First Capital Corp.,*
    786 A. 2d 886 (N.J. Super. App. Div. 2001).........................................26, 29

*Groff v. Continental Inc. Co.*,
    741 F. Supp. 541 (E.D.P.A. 1990)............................................................ 16-20

*Guidotti v. Legal Helpers Debt Resolution, LLC*,
    716 F.3d 764 (3d Cir. 2013), *("Guidotti I")* ...........................8, 11, 14, 22, 29

*Hall v. Treasure Bay Virgin Islands Corp*.,
    371 Fed. Appx. 311 (3d Cir. 2010) ......................................................51, 52

*Hedberg v. Ind. Bell Tel. Co.*,
    47 F.3d 928 (7th Cir. 1995) ...........................................................18

*Jiang v. Bldg. Materials Corp. of Am.*,
    No. A-4269-12T4, 2014 WL 5431335
    (N.J. Super. Ct. App. Div. Oct. 28, 2014) ...................................................45

*Kaneff v. Delaware Title Loans, Inc.*,
    587 F.3d 616 (3d Cir. 2009) ........................................................11

*Khan v. Dell Inc.*,
    669 F.3d 350 (3d Cir. 2012) ......................................................40, 52

*Khan v. Dell Inc.*,
    No. CIV.A. 09-3703 (MAS)(TJB), 2014 WL 718314
    (D.N.J. Feb. 1, 2014) ......................................................44

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
    560 F.3d 156 (3rd Cir. 2009) ........................................................21

*Lawrence v. Tandy & Allen*,
    100 A.2d 891 (N.J. 1953) ......................................................28, 29

*Martinez v. John Hancock Mut. Life Ins. Co.*,
    145 N.J. Super. 301, 367 A. 2d 904 (N.J. Super. Ct. App. Div. 1976) .........31

*MBNA America Bank v. Bibb*,
    2009 WL 1750220 (N.J. Super. Ct. App. Div. Jun. 23, 2009) ...............32, 33

*Morales v. Sun Constructors, Inc*.,
    541 F.3d 218 (3d Cir. 2008) ......................................................38

*Newton v. Am. Debt Serv., Inc.,*
　　854 F.Supp. 2d 712 (N.D. Cal. 2012), *aff'd*
　　549 Fed. Appx. 692 (9th Cir. 2013) ..............................................47

*Order, Mayer v. Verizon New Jersey, Inc.,*
　　No 13-3980-FSH (D.N.J. May 6, 2014).......................................34

*Porreca v. Rose Group*,
　　Civ. No. 13-1674, 2013 WL 6498392 (E.D.P.A. Dec. 11, 2013) ................14

*Pyo v. Wicked Fashions, Inc.*,
　　No. CIV09-2422 (DRD), 2010 WL1380982 (D.N.J. Mar. 31, 2010)...........50

*Quilloin v. Tenet Healthsystem Philadelphia, Inc.,*
　　673 F.3d 221 (3d Cir. 2012) .......................................................11

*Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*,
　　393 A.2d 267 (N.J. 1978) ...........................................................41

*Reynolds v. Islands Mech. Contractors, Inc.*,
　　No. 09-CV-83, 2010 WL 4683719 (D.V.I. Nov. 12, 2010) ........................39

*Richardson v. Virgin Islands Port Auth.*,
　　No. CIV.A. 2009-136, 2010 WL 1641154 (D.V.I. Apr. 21, 2010)..............38

*Rodriguez v. Raymours Furniture Co.*,
　　436 N.J. Super. 305, 93 A.3d 760 (N.J. Super. Ct. App. Div. 2014) ...........45

*Rudbart v. N. Jersey Dist. Water Supply Comm'n*,
　　127 N.J. 344, 605 A.2d 681 (N.J. 1992).......................................44

*Sacchi v. Verizon Online, LLC,*
　　No. 14-CV-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015) ..............34

*Salvadori v. Option One Mortgage Corp.*,
　　420 F.Supp. 2d 349 (D.N.J. 2006)..............................................14

*Seus v. John Nuveen & Co., Inc.*,
　　146 F.3d 175 (3d Cir.1998), *overruled on other grounds*
　　*by, Green Tree Fin. Corp. AL v. Randolph*, 531 U.S. 79 (2000) .................38

*Sitogum Holdings Inc., v. Ropes*,
    352 N.J. Super. 555, 800 A.2d 915 (N.J. Super. Ct. Ch. Div. 2002) ............44

*Thomas v. Jenny Craig, Inc.*,
    No. CIV.A. 10-2287 (JLL), 2010 WL 3076861
    (D.N.J. Aug. 4, 2010) ...........................................................................46, 47

*Tinder v. Pinkerton Security,*
    305 F.3d 728 (7th Cir. 2002) ...........................................................14, 20, 21

*U.S. Legal Services Group, L.P. v. Patricia Atalese,*
    Petition for Writ of Certiorari to the United States Supreme Court,
    Case No. 14-882 (Petition Pending) ............................................................11

*U.S. v. Resnick*,
    No. 10CV3976, 2012 WL 1080221 (N.D. Ill. Mar. 29, 2012)..........17, 18, 20

*Van Orman v. American Ins. Co.,*
    680 F.2d 301 (3d Cir. 1982) ...............................................................27, 28,29

*Visser v. Packer Eng'r Assoc.*,
    924 F.2d 655 (7th Cir. 1991) ......................................................................18

*W. Jersey Title & Guar. Co. v. Indus. Trust Co.*,
    141 A.2d 782, (N.J. 1958) ..........................................................................42

*Webster v. Freedom Debt Relief, LLC*,
    No. 1:10CV1587, 2011 WL3422872 (N.D. Ohio Aug. 4, 2011)............50, 51

*Williams v. Metzler,*
    132 F.3d 937 (3d. Cir. 1997) ......................................................................28

*Williams v. Nabors Drilling USA*,
    LP, No. CIV.A. 13-1013, 2014 WL 710078
    (W.D. Pa. Feb. 25, 2014)...........................................................................45

*Willis v. Debt Care USA, Inc., et al.,*
    No. 3-11-CV-430-BR, 2012 WL 5844695 (D. Or. Nov. 19, 2012)..............33

*Wright v. Universal Mar. Serv. Corp.*,
    525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998) ...................................41

## *Statutes*

9 U.S.C. § 4 .............................................................................................22

9 U.S.C. § 16(a)(1)(B) ...............................................................................1

28 U.S.C. § 1332(d) ...............................................................................1, 7

28 U.S.C. § 1441 ........................................................................................7

28 U.S.C. § 1446 ........................................................................................7

28 U.S.C. § 1453 ........................................................................................8

Fed. Appx. 692 (9th Cir. 2013) ...............................................................47

5 V.I .C. § 815) ........................................................................................39

## **Other Authorities**

Justice Holmes, THE PATH OF THE LAW, 10 Harv. L. Rev. 457 (1897) ...................29

BLACK'S LAW DICTIONARY (19th ed.) ......................................................23

## STATEMENT OF JURISDICTION

Jurisdiction in this Court is based on 9 U.S.C. § 16(a)(1)(B) as the order under review denies a motion to compel arbitration.

Jurisdiction in the district court is based on provisions of the Class Action Fairness Act codified at 28 U.S.C. § 1332(d).

This is a non-final appeal.

The notice of appeal was timely filed on December 31, 2014 to review the order entered December 3, 2014 [Doc. 173].

## **STATEMENT OF THE ISSUES**

I.      Whether Guidotti failed to demonstrate a genuine issue of material fact regarding her agreement to arbitrate, including,

      A.      Her receipt of the Account Agreement and Disclosure Statement ("AADS"), including its arbitration clause, at the time she applied for her account.  D.E.155-11, p.13; A21, 22, or;

      B.      Her agreement that the AADS was incorporated by reference. D.E.155-11, p.33; A21, 23, or;

      C.      Her performance and acceptance of performance under the AADS after her admitted receipt of the AADS.  D.E.155-11, p.26; A21?

II.     Whether the decision of the New Jersey Supreme Court in *Atalese* is pre-empted by the Federal Arbitration Act?  D.E.171, A25-30.

III.    Whether the arbitration clause should be enforced where the district court correctly found that there was no procedural unconscionability, or because the district court erred in finding portions of the arbitration clause to be substantively unconscionable, or because any substantively unconscionable provision could be severed?  D.E.155-11, p.39, A34-37.

2

## STATEMENT OF THE CASE

Plaintiff DAWN GUIDOTTI ("Guidotti") apparently chose to incur consumer and credit card debt beyond her ability or willingness to repay. She engaged Legal Helpers Debt Resolution ("LHDR") as her attorneys in an attempt to resolve her debt for less than the full amount owed. A564-565. She also engaged the services of Rocky Mountain Bank & Trust, a Colorado bank ("RMBT") and Global Client Solutions, LLC ("Global"). RMBT performs traditional banking functions, such as facilitating Automated Clearing House ("ACH") functions for account holders. Global is an Oklahoma limited liability company. As the agent of RMBT, Global processes ACH transactions for account holders such as Guidotti. A718; A808. Global was the processor for all activity in Guidotti's accounts at RMBT, and the ACH transfers to which she refers in Paragraph 23(b) of her First Amended Complaint, A142, were performed by Global at the authorization and direction of Guidotti. Pursuant to the terms of Guidotti's agreements with RMBT, Global and LHDR, neither RMBT nor Global conducted any negotiations with any of Guidotti's creditors. A308.

On September 21, 2009, Eclipse Financial, Inc. ("Eclipse") emailed Guidotti the relevant program documents through email and the DocuSign system. A249, ¶¶2-3; A555. Although Guidotti has no recollection of the September 21, 2009 DocuSign documents, DocuSign's "Certificate of Completion" reflects that

Guidotti received ten documents on September 21, 2009, and on September 22, 2009 she signed the documents. A9; A484; A249 ¶¶ 3, 6; A719. Included with the September 21, 2009, enrollment document was also Global's Special Purpose Account Application ("SPAA"). A249. The SPAA that Guidotti signed on September 22, 2009, specified Guidotti's monthly debit amount for each month under her program, $348.68, and incorporates and acknowledges receipt of the Account Agreement and Disclosure Statement ("AADS"). A249, ¶¶ 4-6. The AADS contains an arbitration agreement. A254. ¶ 20.

After Guidotti signed the first set of documents, on September 24, 2009, Joel Gavalas of JG Debt Solutions ("JG") spoke with Guidotti to confirm her understanding of her debt resolution program. A250, ¶¶ 8-9. On September 28, 2009, Eclipse sent to Guidotti via email a revised set of documents to reflect the increase in the monthly program savings amount to $353.62. This email included both the SPAA and AADS. A251, ¶¶ 10-11; A966; A556. On September 29, 2009, Eclipse, this time through DocuSign, sent Guidotti the set of revised documents. A252. Without taking the time to read any of the documents and simply by "pointing and clicking," Guidotti electronically signed the revised documents and promptly sent them back through the DocuSign service. A10; A252, 253; A272, lines 13-20. DocuSign's "Certificate of Completion" reflects

that Guidotti received ten documents on September 29, 2009, and completed signing the revised DocuSign documents on September 30, 2009.  A485.

Both SPAAs' signed by Guidotti recited the following language:

> I understand that the Account's features, terms, conditions and rules are further described in an Account Agreement and Disclosure Statement that accompanies this Application (the "Agreement").  *I acknowledge that I have received a copy of the Agreement; that I have read and understood it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions.*

A303; A718 (all emphasis in original).  Guidotti admitted that she never read the incorporation by reference language which appeared in both the September 22, 2009 and September 30, 2009 SPAAs that she signed.  A276, lines 1-23; *See* A292, 303.

Global's routine business practice required that the AADS accompany the SPAA in which it is incorporated by reference.  A251, ¶11, n.13; *See also,* A489; A505, 506.  Eclipse complied with Global's requirement by emailing Global's SPAA and AADS.  A413, lines 17-25; A966; A555, 556.

Also as a matter of its business routine, Global, through it mail servicer Compu-Mail, sent Guidotti a "Welcome Letter" which was dated September 29, 2009 and included a copy of the AADS.  A253, ¶15; *see also.* A487; A500-503.  Guidotti acknowledged that she also received a copy of the AADS in the packet she received in the mail from LHDR on October 19, 2009.  A254, ¶22; A311;

A330, 331; A280, lines 13-21.  Global, through its mail servicer Compu-Mail, sent

Guidotti a second "Welcome Letter" which was dated February 3, 2010, which also

included a copy of the AADS.  A255, ¶26.  Guidotti admitted that while she had

the program documents including the Global SPAA and AADS, in her possession

and could have read them, she never did so.  A254, ¶21.

> The AADS requires arbitration of any disputes, as follows:

> > **Arbitration and Application of Law:**  In the event of a
> > dispute or claim relating in any way to this Agreement or
> > our services, you agree that such dispute shall be
> > resolved by binding arbitration in Tulsa, Oklahoma,
> > utilizing the qualified independent arbitrator of Global's
> > choosing.  The decision of an arbitrator will be final and
> > subject to enforcement in a court of competent
> > jurisdiction.

A331.  Guidotti did not object to the arbitration clause or close her Special Purpose

Account with Global.  The AADS also provides,

> > You [Guidotti] are the only one that has the right to
> > authorize the transactions relating to your Account; and
> > you may withdraw funds from your Account and/or close
> > it at any time in a manner provided for below.
> > * * *
> > You may terminate this Agreement and close your
> > Account at any time by sending a written notice to
> > Global customer service.

A330.

Under the terms of her AADS, Global administered account processing for

Guidotti for account ending in 5699 ("Account #5699") and for account ending in

9546 ("Account #9546").  A254, ¶ 23; *See* A367-391.  Guidotti did not deposit any

of her first three payments under her debt settlement plan into either Account 5699 or Account 9546; instead she paid LHDR directly from her TD bank account. A256, ¶24; *see also,* A342, 344, 345. It was not until December 30, 2009, that Guidotti deposited $120.34 into her Account #5699, an amount she transferred to Account #9546 on March 22, 2010. A255, ¶ 25. On February 2010, Global pursuant to Guidotti's authorization began to withdraw $353.62 from her TD Bank account and deposit it to Guidotti's program Account #9546. A255, ¶ 27; A346. From the beginning of February 2010, and through early 2011, Guidotti used and Global provided her with account processing for her Account #9546 as shown in the monthly account statements Guidotti received by mail. A255-256, ¶¶ 28-29; A367-391. In early 2011 Guidotti closed her RMBT Account #9546, and Global sent her a check for $1,723.09 representing the balance of the funds in Account #9546 at the time it was closed. A256, ¶¶ 30-31; A398. After participating in her debt settlement program and allowing ACH transfers by Global into her RMBT account for a year, Guidotti commenced this litigation.

Guidotti filed her class action complaint against numerous individual and corporate defendants in the Superior Court of New Jersey on January 28, 2011. On March 4, 2011, Guidotti's Complaint was removed pursuant to 28 U.S.C. §§ 1441, 1446 and the Class Action Fairness Act of 2005 codified in 28 U.S.C. §§ 1332(d)

and 1453.  A119.  Guidotti filed a First Amended Class Action Complaint on March 17, 2011.  A129.

On May 23, 2011 defendants Global and RMBT moved to compel arbitration pursuant to Guidotti's arbitration provision.  D.E.27.  The district court denied Global and RMBT's initial Motion to Compel Arbitration finding that there was no agreement to arbitrate.  D.E.103.  Global and RMBT appealed the district court's decision to this Court.  This Court vacated the district court order denying Global and RMBT's motion to compel arbitration, and concluded:

> The District Court should not have denied the Appellants' motion to compel arbitration without first allowing limited discovery and then entertaining their motion under a summary judgment standard. If, after presentation of the evidence uncovered during discovery, a genuine dispute of material fact remained, the Court then should have submitted to a jury (if either party demanded one) the factual question of whether Guidotti was aware of the arbitration clause in the Account Agreement at the time she signed and submitted the SPAA.

*Guidotti v. Legal Helpers Debt Resolution, LLC,* 716 F.3d 764, 780 (3d Cir. 2013) *("Guidotti I").*  This Court remanded for further proceeding consistent with the Court's opinion.  *Id.* at 781.  The parties engaged in discovery on the limited issue of arbitration.   Global and RMBT filed their Renewed Motion to Compel Arbitration ("Renewed Motion") using the modified summary judgment standard set by this Court.  D.E.155, including exhibits D.E.155-1 through 155-13.

22672843.5

Pointing to the record, RMBT and Global argued that Guidotti is subject to a valid and enforceable agreement to arbitrate, that Guidotti's conduct established mutual assent, that Guidotti's dispute fell within the scope of that agreement, and that there can be no class arbitration.  D.E.155-11.

In her Response, the Plaintiff argued that she did not receive or have access to Global's AADS either before she signed the SPAA or before she made use of her account, that her conduct did not constitute acceptance of the AADS, that the provisions of the AADS were not properly incorporated by reference, that the arbitration clause was unconscionable and unenforceable, and that the issues regarding class arbitration are premature.  D.E.157.

After Global and RMBT filed their reply brief, the Supreme Court of New Jersey issued its opinion in *Atalese v. U.S. Legal Services Group L.P.,* 99 A.3d 306 (N.J. 2014).  The parties filed supplemental letters discussing the effect of *Atalese* on the arbitration provision before the district court.  DE169.  Plaintiff argued that the arbitration provision in Global's AADS suffered from the same deficiencies found in *Atalese.*  DE170.  Specifically, that the arbitration provision fails to explain that the consumer is waiving her right to seek relief in court for breach of statutory rights, what arbitration is and how arbitration differs from court proceeding, and was not in clear and plain language for average consumers to understand they are waiving statutory and constitutional rights. DE170.  Global

and RMBT responded and argued that New Jersey's Supreme Court's *Atalese* rule is not a rule generally applicable to contact defenses, and even if it was, such rule was preempted by the Federal Arbitration Act because in practice it would have a disproportionate impact on arbitration agreements. DE171.   Global and RMBT also argued that applying the *Atalese* rule would negate mutual assent in cases, such as in that of Guidotti, where there was a meeting of the mind as to the agreement to arbitrate.   DE171.

Turning to the arbitration issues, the court rejected Global and RMBT's assertion that the record show Guidotti received the AADS in two separate emails, which did not bear DocuSign stamps.   A8.   The court also rejected Guidotti's argument that she began to use her accounts prior to receiving her AADS.   A13. The district court found that factual disputes precluded a finding for Global and RMBT that the "AADS accompanied the various initial collection of documents," that the AADS was properly incorporated by reference to the SPAA and that Plaintiff had the AADS at the time of signing the SPAA.   A21-24.   The district court did not address Global and RMBT's argument that Guidotti accepted the AADS by using her accounts after receiving the AADS.   Instead, the district court concluded that because the arbitration provision failed to comply with *Atalese*'s requirements there was no meeting of the mind between the parties.   A25-31. Furthermore, the district court found that even if *Atalese* was preempted by the

FAA, the arbitration provision would fail as substantively unconscionable, even though the court concluded that the provision is not procedurally unconscionable. A30-37. Based on its finding, the district court concluded that Guidotti did not agree to arbitrate her claims with Global and RMBT, and denied Global and RMBT's Renewed Motion to Compel Arbitration. A38. This appeal timely followed.

## STANDARD OF REVIEW

This Court exercises plenary review over questions regarding the validity and enforceability of arbitration agreements. *Quilloin v. Tenet Healthsystem Philadelphia, Inc.,* 673 F.3d 221, 228 (3d Cir. 2012). A question concerning the applicability or scope of an arbitration agreement is reviewed *de novo*. *Kaneff v. Delaware Title Loans, Inc.,* 587 F.3d 616, 620 (3d Cir. 2009).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This matter was previously before the Court in case No. 12-1170. *Guidotti v. Legal Helpers Debt Resolution, LLC,* 716 F.3d 764 (3d Cir. 2013). Moreover, the following matters are related to this proceeding:

1)  *U.S. Legal Services Group, L.P. v. Patricia Atalese,*
    Petition for Writ of Certiorari to the United States Supreme Court
    Case No. 14-882 (Petition Pending).

## SUMMARY OF ARGUMENT

Motions to compel arbitration proceed in the same fashion as motions for summary judgment if there is any dispute about the making of the agreement to arbitrate.   When presented with a properly documented motion to compel arbitration, the opponent is required to bring forth evidence.   Here, faced with evidence that she received the AADS, Guidotti did not bring forth any evidence to support her denial of receipt, relying instead upon argument of counsel and her lack of recollection.   This is insufficient to create a genuine issue of material fact.   Alternatively, whether Guidotti received the AADS is not material because she expressly acknowledged that the AADS was incorporated by reference.   Alternatively, Guidotti demonstrated her acceptance of the terms of the AADS by her actions after she received the AADS.

The *Atalese* decision violates Supreme Court precedent regarding the FAA and its pre-emption of state law that undermines arbitration.   The *Atalese* rule relies on creation of a right to sue in court, and thus targets arbitration.   The "knowing and voluntary waiver" requirement of *Atalese* has been found by this Court not to be a generally applicable contractual defense that would survive the FAA's pre-emption.   In addition, the *Atalese* rule violates the principle that ambiguity must be resolved in favor of arbitration and New Jersey law cited in *Atalese* does not support this decision.

The district court correctly found that there was no procedural unconscionability.  That should have ended the unconscionability analysis in favor of arbitration.  Alternatively, the provisions singled out by the district court have been held not to be substantively unconscionable, or could have been severed.

22672843.5

## **ARGUMENT**

### I.  **THERE IS NO DISPUTE OF MATERIAL FACT THAT GUIDOTTI AGREED TO ARBITRATE HER CLAIMS WITH GLOBAL AND RMBT.**

When a motion to compel arbitration and incorporated documents facially establish arbitrability, but the non-movant has come forward with enough evidence in response to place arbitrability at issue, the issue should be judged under summary judgment standard.  *Guidotti I,* 716 F.3d at 774.  This Court clarified that under this process, a party seeking to compel arbitration must come forward with proof of the existence of an agreement to arbitrate, and upon satisfying that initial burden, the burden shifts to the opponent of the motion to demonstrate a genuine issue of material fact.  *Guidotti I,* 716 F.3d at 774; *see also Tinder v. Pinkerton Security,* 305 F.3d 728, 735 (7th Cir. 2002); *Salvadori v. Option One Mortgage Corp.,* 420 F.Supp. 2d 349, 353 (D.N.J. 2006); *Porreca v. Rose Group*, Civ. No. 13-1674, 2013 WL 6498392, *6 (E.D.P.A. Dec. 11, 2013).  This Court further emphasized that from this point, the procedure for resolving a motion to compel arbitration departs from the summary judgment template.  If a genuine issue of material fact is raised in opposition to a motion to compel arbitration, the motion to compel is not denied; rather, the court must proceed to an evidentiary hearing on the issue raised.  *See Guidotti I,* 714 F.3d at 780; *Porreca*, 2013 WL 6498392, at *6; 9 U.S.C. § 4.

In this instance, Global and RMBT met their initial burden of showing the existence of an agreement to arbitrate by showing that Guidotti did receive the AADS containing the arbitration clause along with SPAA prior to beginning her contractual relationship with Global and RMBT; that Guidotti acknowledged the AADS was lawfully and fully incorporated by reference into the SPAA; and that Guidotti manifested her consent to the AADS and its arbitration provision by her conduct. The Plaintiff's response to this prima facie showing falls short of the required demonstration of a genuine issue of material fact. First, Guidotti does not outright dispute she received or acknowledged that she received the AADS. Guidotti simply asserts that she does not recall what happened in 2009. This does not negate the record showing that Guidotti received the AADS with the SPAA. Second, even if Guidotti did have the requisite memory to create an issue of fact, she simply failed to read any of the documents she signed or received; thus, she cannot negate that the AADS was properly incorporated by reference or that she was bound by the terms of her AADS. Finally, Guidotti's conduct and performance under the terms of the AADS after she had ample opportunity to read it and to cancel her account affirms that she was bound by the arbitration provision which was in her AADS. Thus, the district court erred when it denied Global and RMBT's Renewed Motion to Compel Arbitration based on a finding that a dispute of material fact existed as to the making of the arbitration provision.

### A.   Guidotti received the AADS with her SPAA and her lack of recollection does not create a genuine issue of material fact.

Guidotti's own testimony and other documents in the record establish that there is no genuine issue that Guidotti received the AADS and agreed to arbitrate her claims with Global and RMBT.  Guidotti's attempt to create an issue fails because Guidotti cannot controvert her own testimony and the record evidence by claiming lack of recollection. Guidotti testified that she did sign the SPAA and received the AADS on September 29, 2009, and, despite what the evidence demonstrated, asserted that she does not recall receipt of the SPAA and AADS on other occasions.  A1038-1040, 1048.  Courts within the Third Circuit recognized that "lack of memory or knowledge alone is insufficient to create a genuine issue of material fact . . . [and t]herefore, the evidence presented . . . remains uncontradicted." *Groff v. Continental Inc. Co.,* 741 F. Supp. 541, 548 (E.D.P.A. 1990); *see also Aretz v. Plastikos Inc.,* Civ. No. 07-239 Erie, 2009 WL 614812, *1, n.1 (W.D.P.A. Mar. 6, 2009) ("lack of recollection is insufficient to create a fact issue.")

In *Groff*, the court dealt with a dispute over the coverage election under an insurance policy.  *Groff,* 741 F. Supp. at 547-48.  Examining the evidence before it, the court stated that "[w]ithout question, Raymond Groff signed the form which checked a single limit of uninsured motorist coverage in the amount of $35,000. . .

. Raymond Groff himself testified that he never signed anything without knowing what it was." *Id.* at 548.  In response to this evidence, "[p]laintiff asserted that neither Bette nor Raymond Groff remember making the election for lower coverage or recall discussing uninsured motorist coverage. . . ." *Id.*  The *Groff* court found that the evidence presented by the insurance company on the issue remained uncontradicted because the "the lack of memory or knowledge alone is insufficient to create a genuine issue of material fact as to whether Raymond Groff made a knowing and intelligent election for lower uninsured motorist coverage." *Id.*

Likewise, courts within other circuits have also rejected the finding of a disputed material fact when one party simply lacked recollection.  In *U.S. v. Resnick*, No. 10CV3976, 2012 WL 1080221, *1 (N.D. Ill. Mar. 29, 2012), the United States (the "Government") brought an action to collect on past owed taxes, and the matter was pending before the court on summary judgment. *Id.* at *1.  As part of its evidence, the Government pointed to evidence "indicating that Resnick submitted three offers-in-compromise relevant to the calculations of the suspension of the running of the collection period of limitations." *Id.* at *2.  In order to avoid summary judgment, Resnick asserted that "a factual dispute concerning if and when the offers-in-compromise were filed remains, because the evidence offered by the Government is 'inconsistent with Resnick's best recollection.'" *Id.*  Based on

this, Resnick argued that the inconsistent positions of the parties required denial of summary judgment in favor of the Government. *Id.* The court rejected Resnick's position and found that,

> Resnick's lack of memory concerning the offers-in-compromise does not create an issue of fact precluding summary judgment. The Government has presented evidence that Resnick submitted three offers-in-compromise. . . . At the summary judgment stage, the Court will deem that evidence controverted only if Resnick denies it and then refers the Court to some evidentiary support for that denial.

*Id.* at *3. *See also, Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 932 (7th Cir. 1995); *Visser v. Packer Eng'r Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991).

Here, like in *Groff* and *Resnick*, Guidotti attempts to contradict her own testimony as well as the established record by merely claiming lack of knowledge. First, like in *Resnick,* Guidotti conceded that she did in fact receive the AADS. During her deposition Guidotti was asked:

> Q.   So you signed this document here, the special purpose account application P00002 [A708], which states that you acknowledged you received the agreement and that you acknowledged you received the agreement and that you read it and understand its terms. So did you receive that agreement?

Guidotti responded by making an unequivocal statement:

> A.   I received this agreement, yes.

A1048.  While this admission alone would establish that Guidotti received, and thus is bound by, the AADS; the evidence presented by Global and RMBT established that Guidotti received the AADS no fewer than seven times during the parties' relationship, including at least four copies during Guidotti's enrollment process.  A249, 251-255, ¶¶2, 3, 11-13, 15, 22, & 26.  Yet Guidotti simply asserted that she does not recall receiving the AADS or reviewing its contents.  A1038-1040, 1048, 1049.

Guidotti asserted that she did not recall receiving or signing the September 21, 2009 SPAA.  The district court found that "[t]hough [Guidotti] has no recollection of receiving such documents by email or signing documents through DocuSign, . . . the DocuSign "Certificate of Completion" reflects that [Guidotti] received on September, 21, 2009, and electronically signed on September 22, 2009, ten documents including [Global and RMBT's] SPAA."  A9.  In another example, Guidotti failed to recall the welcome letter from Global which was addressed to her and dated September 29, 2009. Guidotti stated "I don't remember receiving this particular letter on September 29."  A1049. Guidotti's lack of recollection is immaterial and cannot dispute that Global's September 29 Welcome Letter regarding Guidotti's Account #5699, which also included the AADS, was sent to Guidotti's home address.  A305-308; *compare with* A1032 (confirming

Guidotti's home address).   Here too, the district court agreed with Global that

Guidotti received the welcome letter, which included the AADS.  A11-12.

Much like *Resnick*, Guidotti did not outright deny receipt of the AADS, and

refer to the record to support such denial.  Unlike in *Groff* and *Resnick*, the district

court in Guidotti concluded that factual disputes existed as to whether Guidotti

received the AADS merely because of Guidotti's lack of recollection.   A21-22.

The district court relied on Guidotti's lack of recollection to controvert Global and

RMBT's showing that she in fact received the AADS no fewer than seven times.

As such the Court erred in concluding that a dispute of fact existed as to whether

Guidotti received the AADS.  Thus reversal is appropriate and arbitration should

be compelled.

Guidotti asserted she did not receive the terms of the AADS in order to

avoid her contractual obligations, and the district court afforded her such an

inference.  This Court must conclude such inference was improper in light of the

law and facts that were before the district court. Other courts have properly

rejected similar efforts to evade contractual obligations by simple proclamations of

ignorance of the terms.  In *Tinder v. Pinkerton Security,* 305 F.3d 728, n.13 (7th

Cir. 2002)*,* a plaintiff sought to deny ever receiving the "payroll stuffer" insert in

her paycheck envelope that created an arbitration agreement with the defendant's

employees.  *Id.* at 731, 735, 736.  The initial payroll stuffer was reinforced by an

article in the company's employee magazine, a poster in the workplace, and an additional payroll stuffer. *Id.* at 732. The Seventh Circuit held that the employee's affidavit denying receipt of the notices of the arbitration program was insufficient even to raise a genuine issue of material fact that would avoid her obligation to arbitrate. *Id.* at 736.

The facts of this case are even stronger. Unlike the plaintiff in *Tinder,* Guidotti here signed an application that specifically acknowledged receipt of the agreement containing the arbitration clause. During her deposition, Guidotti affirmed her acknowledgment under oath by testifying that she did receive the AADS along with the SPAA on September 29, 2009. A1048. The record also reflects she received the AADS several times after that date, but prior to making use of her account.

This Court extensively discussed *Tinder* in *Kirleis v. Dickie, McCamey & Chilcote, P.C.,* 560 F.3d 156, 162 (3rd Cir. 2009). This Court distinguished *Tinder* by noting that in *Kirleis* the issue was whether the plaintiff ever "agreed to be bound by the Firm's arbitration provision." What this Court found missing in *Kirleis* is present here. Guidotti has not denied signing the document which states: ***"I acknowledge . . . that I am bound by all of its*** [the AADS's] ***terms and conditions."*** (all emphasis in original). A facile and glib denial of what the Guidotti stated in a signed, contemporaneous document should appropriately be

ignored.  Thus, Guidotti manifested clear and unambiguous intent by her signature on the two SPAAs and her testimony that the AADS governs her contractual relationship with Global and RMBT.

In the alternative, if the district court correctly concluded that a material dispute of fact existed, it should not have denied the Renewed Motion to Compel Arbitration.  The district court instead should have followed the directive of this Court and submitted the remaining factual dispute to a summary trial regarding "'the making of the arbitration agreement or the failure, neglect, or refusal to perform the same' as Section 4 of the FAA envisions." *Guidotti I,* 716 F.3d at 776 (quoting 9 U.S.C. § 4).  By denying the Renewed Motion to Compel Arbitration in the face of a perceived factual issue, the district court departed from this Court's directions in the parties' first appeal.

### B.     Alternatively, the AADS was incorporated by reference into the SPAA.

The AADS was lawfully incorporated by reference into the SPAA under New Jersey law, and the two documents were part of a single contract governing the relationship between Global, RMBT, and Guidotti.  The SPAA makes clear and specifically mentions the AADS multiple times and specifically incorporates it by reference.  Guidotti manifested her intention to abide by the terms of the AADS, including the arbitration provision, when she signed the SPAA.  The district court erred in concluding that under New Jersey law the SPAA did not properly

incorporated by reference the AADS, as well as that the SPAA on its terms constituted the entire agreement between the parties.  A22-24.  The record is clear that the SPAA, on its own, does not serve as the parties' complete agreement. Global, RMBT, and Guidotti agreed to treat the AADS, and its terms, as an indispensable part of the SPAA through the incorporation by reference clause. Guidotti was not surprised by the incorporation of the AADS into the SPAA, and any surprise is of her own making.

Contrary to the terms of the SPAA and the evidence presented by Global, the district court concluded that the SPAA standing alone is an agreement and not just an application.    A22-23, n.6.    The last "A" in "SPAA" stands for "Application."    By its plain meaning, "application" is defined as "request or petition," BLACK'S LAW DICTIONARY (19th ed.) p.115.  Whereas "agreement" is defined as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performance[.]", *id.,* p.78.  The two are not synonymous.

The distinction between the terms application and agreement becomes even more apparent here for two reasons: First, the terms "Application" and "Agreement" in the SPAA define and qualify two separate documents; and second, the complete understanding of Guidotti, Global and RMBT's relative rights and obligations are located in the AADS and not the SPAA.  The very first paragraph

of the SPAA informed Guidotti – and requested that she acknowledge that:

> I [Guidotti] understand that the Account's features, terms, conditions and rules, are further described in an Account Agreement and Disclosure Statement that accompanies this Application (the "Agreement"). ***I acknowledge that I have received a copy of the Agreement; that I have read and understood it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions.***

A718; A808 (emphasis in original).  Had Guidotti actually read the language of her SPAA, she would recognize the word "Application" refers to the SPAA itself, and that the term "Agreement," which is mentioned nine (9) times, is defined to mean the AADS.  The distinction between the SPAA and the Agreement becomes even more apparent because Guidotti, did receive a separate document called the AADS several times.  *See* A1048; A305-308; A311, 330-331; A393-396.

The SPAA was simply an application, subject to Global's acceptance.  By completing the SPAA, Guidotti requested that Global open an account for her, subject to required verification pursuant to governmental regulation under the Patriot Act.  A718; A808.  The district court acknowledged that verification was required.  A22-23, n.6.  Had Guidotti's information failed the verification process, no account would be opened.

The SPAA standing alone does not contain vital rights, obligations, and regulations governing Guidotti's accounts.  For example, the SPAA makes no mention that Guidotti's account will be FDIC insured; or how she would access

information about her account; or how she could contact Global-RMBT; or how Guidotti may go about terminating her account; or that she agreed to arbitrate her claim. A718; A808. Such terms did appear in the AADS. A307-308; A330-331; A395-396. Both Global and Guidotti acted on provisions with in the AADS. For example, the account which Global opened for Guidotti was insured by the FDIC, as prescribed by in the AADS. *Id.* Likewise, when Guidotti requested to terminate her agreement and close her account she did so in accordance with the "Termination of Agreement" provision in the AADS. *Id.* Without the AADS, the obligations and rights of Global, RMBT, and Guidotti would not have been complete and at most would be limited to the mere authorization to debit and fund the special purpose account. Thus, the district court erred in concluding that the SPAA alone serves as the agreement. Incorporation of the AADS was required to provide the complete terms of the parties' rights and obligation during the administration of Guidotti's accounts.

Even if Guidotti's memory lapse created a factual issue, the issue of whether the AADS accompanied the SPAA is not material. Under New Jersey law, a document can be incorporated by reference into a contract even if it is not attached to the contract at the time of signing. In *Days Inn Worldwide, Inc. v. Prudent Lodging of Kalamazoo, LLC,* Civ. No. 11-2493, 2011 WL 3329526, *1 (D.N.J 2011), a guaranty agreement incorporated a separate License Agreement which

contained a forum selection clause.  The party signing the guaranty attempted to avoid the forum selection clause by alleging that "he 'never saw' the License Agreement."  *Id.* at *2.  Even accepting this testimony, the district court properly concluded that this averment did not excuse the parties' performance, including adherence to the incorporated forum selection clause.  Ironically, the court likened the parties denial of actual receipt of the incorporated document to a claim that a party failed to read their own contract, citing *Gras v. Associates First Capital Corp.,* 786 A. 2d 886, 894 (N.J. Super. App. Div. 2001), a fault which Guidotti admits.  The district court in *Days Inn* rejected the guarantor's feigned or willful ignorance of the incorporated document as an excuse for failure to perform the contract, and the district court here should have done the same.

The district court in *Days Inn* properly distinguished *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn,* 983 A. 2d 604 (N.J. Super. Ct. App. Div. 2009), noting that,

> *Alpert,* however, dealt with an agreement where the alleged incorporating language stated only that the party 'will be bound 'by [the plaintiff's] standard billing practices and firm policies.' 983 A. 2d at 618 (quoting the agreement).  Here, by contrast, the Guaranty makes explicit reference to the specific sections of the License Agreement; there are no vague references to 'firm policies' or the like.

*Id.* at *2.  The same distinction applies here.  Unlike in *Alpert,* in which a law firm's retainer agreement incorporated "standard billing practices and firm

policies" that, for all the signed retainer agreement said, may not even have been reduced to writing, here Guidotti acknowledged receipt of and being bound by the terms of a specific named and titled document which she admits she received. A1048.

In a similar case, *Van Orman v. American Ins. Co.,* 680 F.2d 301 (3d Cir. 1982), letters and brochures given to employees describing a pension plan incorporated the terms and conditions of the pension plan document itself, which was not delivered to participants "but was purportedly available for inspection." *Id.* at 304.  This Court found the plan document was properly incorporated by reference and was controlling, even as to points in which it was argued to be in conflict with the brochures that the employees received.  *Id.* at 309, 310.  *See also, Blackner v. Continental Air Lines, Inc.,* 311 N.J. Super. 10, 709 A.2d 258 (N.J. Super. Ct. App. Div. 1998).  These cases are consistent with the long line of New Jersey cases providing that when one contract incorporates the terms of another contract, the two are to be considered as one integrated document.  *Eagle Fire Protection Corp. v. First Indemnity of America Insurance Company,* 145 N.J. 345, 678 A.2d 699 (N.J. 1996); *Dawson Corporation v. National Union Fire Insurance Company of Pittsburgh, P.A.,* 285 N.J. Super. 137, 666 A. 2d 604 (N.J. Super. Ct. App. Div. 1995); *Amelco Window Corp. v. Federal Insurance Company,* 127 N.J. Super. 342, 317 A. 2d 398 (N.J. Super. Ct. App. Div. 1974).

The district court rejected Global and RMBT's reliance on these cases asserting that the incorporation by reference here was not as clear and unambiguous as in the *Days Inn,* and noted that "[t]hough New Jersey law recognize that 'two or more writing may constitute a single contract even though they do not refer to each other[,]' whether such writings are to be construed as a single contract depends solely upon the parties' intent."  A22, n.6 (citing to *Van Orman v. Am. Ins. Co.,* 680 F.2d 301, 306 (3d Cir. 1982); *Lawrence v. Tandy & Allen,* 100 A.2d 891, 894-95 (N.J. 1953)).  The district court wrongfully concluded that that "[Global and RMBT] have not demonstrated such intent in this instance." A22, n.6.   However, the document Guidotti admits signing (but not reading) clearly expresses this intent.  In *Williams v. Metzler,* 132 F.3d 937, 947 (3d. Cir. 1997), this Court recognized that,

> [i]nterpretation of contractual language is the first step toward proper construction. . . . In the process of interpreting a contract, the court seeks to ascertain the intent of the parties.  That inquiry, however, does not require a search for the subjective intent of the parties, but rather centers on the intent embodied in the language of the parties chose to memorialize their Agreement.

(internal citation omitted).  *Williams* invokes Justice Holmes' admonition that "the making of a contract depends not on the agreement of two minds, in one intention, but on the agreement of two sets of external signs – not on the parties' having *meant* the same thing, but on their having *said* the same thing."  *Williams,* 132 F.3d

at 947 (quoting Justice Holmes, THE PATH OF THE LAW, 10 Harv. L. Rev. 457, 463 (1897) (emphasis in original)).

Here, Global and Guidotti's objective intent to treat the SPAA and AADS together as a single document governing their contractual relationship is manifested from the documents themselves. Guidotti's objective intent is manifested by her own acknowledgment: ***"I** [Guidotti] **acknowledge that I have received a copy of the Agreement** [the AADS]**; that I have read and understood it; that the Agreement is fully incorporated into this Application by reference; and that I am bound by all of its terms and conditions."*** A718; A808 (all emphasis in original). This acknowledgment objectively demonstrates that the AADS defined therein as the "Agreement" was to be incorporated by reference.

New Jersey law requires that incorporation will not result in surprise. A22-24 (citing to *Van Orman v. Am. Ins. Co.,* 680 F.2d 301, 306 (3d Cir. 1982); *Lawrence v. Tandy & Allen,* 100 A.2d 891, 894-95 (N.J. 1953)). No surprise can exist here for two simple reasons. First, the AADS was expressly incorporated by reference, and Guidotti acknowledged she received, and agreed to be bound by the AADS's terms. Second, Guidotti failed to read what she was bound by anyway. *Gras,* 786 A. 2d at 894 ("'[f]ailure to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading.'") (internal citation omitted). Here, Guidotti cannot avoid the incorporation by

reference of the AADS because she simply failed to read the language alerting her of said incorporation.  A10-11.  Even more so, Guidotti should not be able to avoid the terms of the AADS which were incorporated by reference to the SPAA simply because she decided to ignore and not read them as well.  A11; A1050 (Guidotti acknowledged that would not read what she received in the mail).  Guidotti cannot claim surprise when the surprise is of her own doing.

As in section I(A) above, in the alternative, should this Court find a dispute of material fact to exist with Guidotti's acceptance of the AADS and its terms through incorporation by reference, the proper action would have been to send the dispute to a summary trial pursuant to this Court's instruction and the FAA.  The district court's failure to do so constitutes reversible error.

### C.    Alternatively, Guidotti's conduct and use of her account after admittedly receiving the AADS binds her to its terms, including her obligation to arbitrate her claims.

Even accepting the unsubstantiated assertion that Guidotti did not receive the AADS at the same time she received and signed the SPAA acknowledging that receipt, the subsequent actions of Guidotti bind her to the terms of the AADS. Guidotti does not deny receiving paper copies of the SPAA and AADS from Global at the commencement of the parties' relationship.  A1048; A1051.  Further, Global established, and the district court agreed, that Guidotti's first ACH transfer was made from Guidotti's personal bank account into Guidotti's Special Purpose

Account on December 30, 2009 well after Guidotti admittedly received the AADS. A12; A13, n.4. The AADS specifically provided that she could unilaterally cancel and terminate her relationship with Global and RMBT at any time. A307; A330; A395. Instead, she permitted Global to make ACH withdrawals from her local bank account and accepted Global's and RMBT's services in maintaining her special purpose accounts for a year, [A346-A391] before she changed her mind about the debt settlement program that she had entered into with LHDR and commenced this litigation. The AADS, which Guidotti had in her possession at the time, unambiguously states in its second sentence that "by using your Account, you agree that the Agreement shall apply; and you agree to abide by all of the terms, conditions, and rules set forth herein." A307; A330; A395. Guidotti was required to read the AADS once she admitted receiving it. *See, Martinez v. John Hancock Mut. Life Ins. Co.,* 145 N.J. Super. 301, 310, 367 A. 2d 904, 909 (N.J. Super. Ct. App. Div. 1976) (duty to read insurance policy upon delivery). However, Guidotti followed the same behavior pattern as with any other agreement she received; she simply failed to review the terms governing any of her transactions. A1043-1045 (Guidotti's testimony regarding her pattern of applying for and using credit cards). Although Global and RMBT raised the issue before the district court, and the district court acknowledged the argument to be made, A21, the district court ignored and failed to address the acceptance by continued use argument. As such,

this Court should conclude that Guidotti, by beginning and continuing to use her special purpose account after receiving the AADS, assented to the terms of the AADS, including the obligation to arbitrate her claims.

New Jersey law permits parties to show their acceptance of a contract by their conduct. For example, in *MBNA America Bank v. Bibb*, 2009 WL 1750220 (N.J. Super. Ct. App. Div. Jun. 23, 2009), Bibb applied for and opened an account with MBNA in May 1999. Bibb, however, did not first use her account until February 2003. In the interim, MBNA sent Bibb a modified account agreement in 2001. The 2001 agreement added an arbitration provision. Bibb did not reject the arbitration provision when she received it. *Bibb*, 2009 WL 1750220, at *1.

In late 2004, Bibb stopped paying, MBNA filed a claim in arbitration and obtained an award. MBNA filed a complaint in state court to confirm the award. Bibb argued that MBNA had "unilaterally changed the terms and conditions upon which the account was originally opened, and that she never accepted the amendments as they related to binding arbitration." *Bibb*, 2009 WL 1750220 at *2. The court rejected her contention and "found that the agreement was sent to defendant, that she received it, and that she never formally rejected its terms . . . [and she] was 'bound by the terms and conditions of that agreement which she accepted by the use of that credit card account[.]'" *Bibb*, 2009 WL 1750220, at *2.

On appeal, the New Jersey Superior Court explained that:

> It has long been recognized in New Jersey that in the context of traditional credit cards, the cardholder's decision to use the card provides the requisite assent to the terms of the offer extended by the card's issuance, such that a contract is formed.

*Bibb*, 2009 WL 1750220, at *3.

The appellate court then held that:

> When plaintiff amended its offer, in 2001, defendant still remained free to reject it. She chose not to, however, by utilizing the line of credit, thereby signaling her assent to the terms and conditions of the contract the parties then formed.

*Bibb*, 2009 WL 1750220, at *4.

Like Bibb, Guidotti's decision to use the account provides the requisite assent to the account terms, including arbitration. She admits receiving a copy of the AADS before using the account.  When she began using her accounts on December 30, 2009, under the rule in *Bibb*, she "signaled her assent to the terms and conditions of the contract the parties then formed."  *Bibb*, 2009 WL 1750220, at *4.  Guidotti could have rejected the arbitration provision and chosen to close her Global/RMBT accounts before she ever began using them; but she did not do that.  A307-308; A366-391; A12-14.  Global and RMBT are entitled to enforce the arbitration clause under New Jersey contract law principles.  *See also, Willis v. Debt Care USA, Inc., et al.,* No. 3-11-CV-430-BR, 2012 WL 5844695 *4 (D. Or. Nov. 19, 2012) (applying Oregon Law to the same provision at issue here.)

Other district courts emphasized that under New Jersey law "silence may be deemed acceptance."  *Sacchi v. Verizon Online, LLC,* No. 14-CV-423-RA, 2015 WL 765940, *1, *5 (S.D.N.Y. Feb. 23, 2015).  In *Sacchi,* Verizon argued that New Jersey law permitted a finding of acceptance of the modified terms by continued use of service. *Id.* at *4.  The *Sacchi* court agreed with Verizon that under New Jersey law, acceptance may be established by silence.  *See id.* at *5.  The *Sacchi* court inferred "acceptance by silence" through the principle that continued use of service manifested acceptance of terms.  *Id.* (citing as examples *Order, Mayer v. Verizon New Jersey, Inc.,* No 13-3980-FSH (D.N.J. May 6, 2014), ECF No. 31 (finding acceptance of amendments through use of services pursuant to contracts substantially similar to the one at issue. . .); *Coiro v. Wachovia Bank, N.A.,* No. Civ. 11-3587, 2012 WL 628514, at *3 (D.N.J. Feb. 27, 2012) (finding acceptance through silence and stating that '[u]nder New Jersey state law, silence may be deemed acceptances 'where the particular circumstances reasonably impose on the offeree a duty to speak if the offer is rejected. [internal quotation omitted])).

II.   **THE *ATALESE* RULE DISPROPORTIONATELY IMPACTS ARBITRATION AGREEMENTS AND, SO, IS INCONSISTENT WITH AND PREEMPTED BY THE FEDERAL ARBITRATION ACT.**

In *Atalese v. U.S. Legal Services Group, L.P.*, 99 A.3d 306, 314 (N.J. 2014), the New Jersey Supreme Court ("NJSC") created a rule that presumes that a reasonable, average consumer could never, on his or her own, understand that "arbitration" by its very nature means the giving up of a right to sue in court. The NJSC, therefore, held that no arbitration provision is enforceable under New Jersey law unless it specifically explains to the consumer, in a "clear and unequivocal" way, that by agreeing to arbitration, he or she is giving up the time-honored right to sue in a court of law. *Atalese,* 99 A. 3d at 314. In other words, no agreement to arbitrate can be formed under New Jersey law (regardless of what the consumer *actually* knows or understands about arbitration) unless the agreement contains some further explanatory language about the meaning of arbitration. *See id.*

*Atalese* paid lip service to *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011), and its ruling that only defenses that are truly applicable to contract claims in general survive the pre-emption of the FAA, by stating that the rule it created is "not specific to arbitration provisions" and that, under New Jersey law, any waiver of a constitutional or statutory right must be clear and unambiguous. *Atalese,* 99 A.3d at 313. But there is no doubt that the *Atalese* rule requiring that arbitration provisions include "some explanatory comment-that arbitration is a

substitute for the right to have one's claim adjudicated in a court of law" [*Atalese,* 99 A.3d at 313], does, in reality, run afoul of the FAA's mandate that a state not subject an arbitration agreement to more burdensome requirements than other contractual provisions. *Atalese,* 99 A.3d at 312.  At this writing, a petition for writ of certiorari is pending in the United States Supreme Court challenging *Atalese.*

> **A.    The NJSC created a right to sue "in court" for all claims where no such right previously existed, resulting in the invalidation of arbitration provisions, but not other contractual provisions.**

There is no general federal right of access to the state or federal courts, only a right to due process – *i.e.*, the right to notice and an opportunity to be heard. *Choice v. Option One Mortgage Corp.*, No. CIV.A. 02-6626, 2003 WL 22097455, at *8 (E.D. Pa. May 13, 2003).  Arbitration "does not deprive an individual o[f] his or her due process rights; it merely provides an alternative forum for the adjudication of such rights." *Id.*  Further, the "Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court." *Id.*

In sum, constitutional due process does not confer a right to court – only a right to sue – *i.e.*, notice and an opportunity to be heard; and, arbitration does not deprive one of that right.  And, if the litigation is not proceeding in court (which it is not if there is an agreement to arbitrate), then there is no right to a jury trial.  As there is no constitutional right to sue in court, then the question becomes: whether

there is a statutory right to sue in court. The answer to this question will undoubtedly vary.

With common law claims, there is no statutory basis upon which to assert a right to sue in court. Thus, the *Atalese* rule should not and cannot be used to avoid arbitration of common law claims to which there is no right to sue in court (because no right is being waived). And, as to statutory claims, a court must analyze the statutory text to determine whether such right exists.

This demonstrates the fundamental problem with the *Atalese* rule. The rule requires an analysis of each claim asserted to determine whether a right to sue in court actual exists as to each such claim, an analysis that is not required in determining the enforcement of any other contract provision, thus, singling out arbitration provisions. Then, under the rule, some claims would require more detailed waiver language and some would not. The rule, further, has a disproportionate impact on arbitration provisions because in no other context has a court first created a right, and then concluded that a clear and unmistakable waiver is required. The rule, thus, will invalidate arbitration provisions at a greater rate than other contract provisions.

The eight (8) cases cited in *Atalese* regarding "waiver-of-rights" provisions actually illustrate the lack of a right to sue in court. *Atalese*, 99 A.3d at 313-14. Indeed, in the cases cited, a clear statutory right already existed (for instance,

"statutory rights to evidentiary materials in anti-discrimination" cases; "statutory right to file grievances"; "statutory right to hearing following refusal to renew license"; "statutory rights under Condominium Act"; "statutory right to a judicial forum for claims of employment discrimination." *Id*.)  So, this rule (which assumes every claim provides a right to sue in court) is only applicable when an arbitration provision is at issue.  Such a rule, in contravention of *Concepcion*, derives its meaning from the fact that an arbitration agreement is at issue.  For this reason alone, the Court should hold that the *Atalese* rule is preempted by the FAA.

### B.    The Third Circuit has definitively held that a "knowing and voluntary" standard is not a generally applicable contract defense and does not apply to the validity of an arbitration agreement.

The Third Circuit has already definitively held that a "knowing and voluntary" relinquishment of rights standard (such as the *Atalese* rule) does not apply to arbitration provisions because it is inconsistent with the FAA.  *Morales v. Sun Constructors, Inc*., 541 F.3d 218, 223-24 (3d Cir. 2008); *Seus v. John Nuveen & Co., Inc*., 146 F.3d 175, 183-84 (3d Cir.1998), *overruled on other grounds by, Green Tree Fin. Corp. AL v. Randolph*, 531 U.S. 79 (2000).

Federal district courts within the Third Circuit addressing this exact issue have followed suit as they are required; thus, further showing the district court's error in applying the *Atalese* rule to find Global's arbitration provision unenforceable here.  *See, e.g., Richardson v. Virgin Islands Port Auth*., No. CIV.A.

2009-136, 2010 WL 1641154, at *6 (D.V.I. Apr. 21, 2010); *Reynolds v. Islands Mech. Contractors, Inc.*, No. 09-CV-83, 2010 WL 4683719, at *3 (D.V.I. Nov. 12, 2010); *Fitz v. Islands Mech. Contractor, Inc.*, No. CIV. 08-CV-00060, 2010 WL 2384585, at *7 (D.V.I. June 9, 2010).

The Virgin Islands (a territory sitting within the Third Circuit) has a specific statute dealing with the waiver of rights which states that "[a]n agreement that waives a right guaranteed by the Constitution of the United States, is unenforceable, unless the waiver of the right is agreed to knowingly and voluntarily." *Reynolds*, 2010 WL 4683719, at *3 (citing 5 V.I .C. § 815). The District Court of the Virgin Islands ("DCVI"), however, stated that this statute could not be used to invalidate an arbitration agreement under the FAA because it is not a generally applicable contract defense. *Id.* Indeed, it does not apply to "any contract"; it is limited solely to a "specific type of contract, namely, those involving a waiver of constitutional rights." *Id.* The DCVI, thus, properly concluded that "[b]ecause section 815 places contracts concerning constitutional rights 'in a class apart from any contract and singularly limits their validity,' " §815 is preempted by the FAA." *Id.*

Just like section 815 of the Virgin Islands Code, the *Atalese* rule solely applies to a specific type of contract, namely, only those contracts purporting to waive statutory or constitutional rights. The *Atalese* rule does not apply to any

other contract and so, like the Virgin Islands statute, cannot be said to be a "generally applicable contract defense."  It is, therefore, inconsistent with and preempted by the FAA just like the Virgin Islands statement.

      **C.**    **The Third Circuit has definitively held that ambiguities in an arbitration provision should be resolved in favor of arbitration.**

It is well settled in the Third Circuit that the FAA requires that any ambiguity in the language of an arbitration provision be resolved in favor of arbitration, not against it.  *Khan v. Dell Inc.*, 669 F.3d 350, 356 (3d Cir. 2012).

Yet, in application the *Atalese* rule actually requires that ambiguities be resolved against arbitration.  Indeed, *Atalese* clearly stated that no "magic words" were required to accomplish a clear and unmistakable waiver; thus, the analysis and determination of whether the language of an arbitration provision clearly and unequivocally explains that a consumer is waiving his or her right to sue in court becomes highly subjective.  And, if a court finds, in its subjective analysis of the language of an arbitration provision, that the language is ambiguous as to whether it constitutes a sufficient waiver, the *Atalese* rule requires that the court resolve that ambiguity *against* arbitration, not in favor of it – in direct contravention of the FAA and Third Circuit.

### D. The cases cited in *Atalese* are inapposite to the issue of sufficient waiver-of-rights language.

*Atalese* cited eight (8) cases, to conclude that the *Atalese* rule applies to all "waiver-of-rights" provisions, and not just to arbitration provisions. *Atalese*, 99 A.3d at 313-14. However, the majority of the cases cited do not support the NJSC's rationale.

For instance, *Atalese* cited a United States Supreme Court case (having nothing to do with New Jersey law), *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80, 119 S.Ct. 391, 396, 142 L.Ed.2d 361, 371 (1998), to say "holding that 'union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination' must be 'clear and unmistakable.'" *Atalese*, 99 A.3d at 314. Yet, the Supreme Court acknowledged in this case that the "clear and unmistakable" standard only applies when a union is waiving rights of represented employees – not when an individual is waiving his own rights. *Id.* (citing to *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)). Thus, this case holds no support for the *Atalese* rule.

Additionally, in *Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High Sch. Bd. of Educ.*, 393 A.2d 267 (N.J. 1978), there was no discussion whatsoever of contract language to determine whether a waiver-of-rights provision was sufficiently clear and unambiguous. In fact, the court in this case simply concluded that a statute, the

Employer-Employee Relations Act, expressly prohibited parties from modifying rights under the Act via a negotiated contract.

In *W. Jersey Title & Guar. Co. v. Indus. Trust Co.*, 141 A.2d 782, (N.J. 1958), there was also no discussion whatsoever of contract language to determine whether a waiver-of-rights provision was sufficiently clear and unambiguous. The court in this case actually stated that the "waiver" doctrine was entirely irrelevant to the facts of the case; and, in any event, the waiver was based on inaction on the part of one of the parties – not on any contract or contractual provision. *Id.* at 786. Likewise, in *Amir v. D'Agostino*, 744 A.2d 1233 (N.J. Super. Ct. Ch. Div.1998), the issue of waiver was premised upon the inaction of one of the parties and no contract was involved; thus, the court never discussed sufficient language regarding a clear and unmistakable waiver.

In *Christ Hosp. v. Dep't of Health & Senior Servs.*, 748 A.2d 1156 (N.J. Super. Ct. App. Div.2000), again, the waiver at issue was premised upon the action taken by Christ Hospital. Thus, there was no discussion of contract at all, let alone the specific language of a contract provision in order to determine whether a waiver-of-rights provision was sufficiently clear and unambiguous.

In *Franklin Twp. Bd. of Educ. v. Quakertown Educ. Ass'n*, 643 A.2d 34 (N.J. App. Div.1994), the court (in no more than 3 sentences) addressed whether the parties had settled all disputes – including one party's right to recover costs

pursuant to a court order – by virtue of a hand written return-to-work agreement which literally made no reference at all to costs. *Id.* at 53. The court, therefore, stated there was no waiver and also seriously questioned whether parties could even waive a court order without the court's written consent. *Id.*

The NJSC also cited to *Dixon v. Rutgers, the State Univ. of N.J.*, 541 A.2d 1046 (N.J. 1988) and *Elevator Co. v. Stafford*, 111 A. 695 (N.J. Sup. Ct.1920). While these two cases did discuss – albeit very briefly – waiver in the contract setting, in neither case was a contract or contractual provision declared unenforceable. The cases cited by the NJSC simply do not support the NJSC's rationale that entire arbitration provisions, regardless of how detailed, must be declared unenforceable if it does not contain an explanatory comment regarding the meaning of arbitration and that one is waiving a right to sue in court.

22672843.5

### III. THE ARBITRATION CLAUSE IS NOT UNCONSCIONABLE.

#### A. New Jersey law requires a showing of both procedural and substantive unconscionability before a contract provision can be declared unenforceable.

Because the district court definitively found no procedurally unconscionability with respect to the Global and RMBT arbitration provision, A34, it erred in declaring the arbitration provision unenforceable based solely on substantive unconscionability.

Under New Jersey law, before a court may refuse to enforce an arbitration provision, a showing of both procedural and substantive unconscionability is required. *Khan v. Dell Inc.*, No. CIV.A. 09-3703 (MAS)(TJB), 2014 WL 718314, at *6 (D.N.J. Feb. 1, 2014) ("In New Jersey, to invalidate an agreement by defense of unconscionability, a court must find both procedural and substantive unconscionability." Citing *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 356, 605 A.2d 681 (N.J. 1992).); *see also Bourgeois v. Nordstrom, Inc.*, No. CIV.A. 11-2442 KSH, 2012 WL 42917, at *6 (D.N.J. Jan. 9, 2012) ("Under New Jersey law, the unconscionability inquiry requires the evaluation of two different factors — procedural unconscionability and substantive unconscionability . . . A sufficient showing of both factors should be made by the complaining party for a contract to be deemed unconscionable." Emphasis added; citing *Sitogum*

*Holdings Inc., v. Ropes*, 352 N.J. Super. 555, 564, 800 A.2d 915 (N.J. Super. Ct. Ch. Div. 2002).)

This unconscionability analysis is generally referred to, under New Jersey law, as a "sliding scale" approach. *See, e.g*., *Jiang v. Bldg. Materials Corp. of Am.*, No. A-4269-12T4, 2014 WL 5431335, at *6 (N.J. Super. Ct. App. Div. Oct. 28, 2014) ("Generally, a 'sliding scale' analysis is utilized in tandem, considering the respective degrees of procedural and substantive unconscionability found to exist . . . Under this approach, overall unconscionability may be found if there is a gross level in one category but only a lesser level in the other." Citations omitted.); *see also, Rodriguez v. Raymours Furniture Co*., 436 N.J. Super. 305, 317, 93 A.3d 760, 767 (N.J. Super. Ct. App. Div. 2014) (same). Accordingly, if no procedural unconscionability exists, then substantive unconscionability is irrelevant and *vice versa. See, e.g., Williams v. Nabors Drilling USA*, LP, No. CIV.A. 13-1013, 2014 WL 710078, at *8 (W.D. Pa. Feb. 25, 2014) (stating that, under Pennsylvania law – which like New Jersey law  utilizes a sliding scale approach to unconscionability – because plaintiff failed to show any substantive unconscionability, procedural unconscionability was irrelevant.)

As stated above, the district court found absolutely no procedural unconscionability in the arbitration provision at issue here; thus, it was not

permitted, under New Jersey law, to rely solely on substantive unconscionability to declare the arbitration provision unenforceable.

> **B.    Alternatively, Global and RMBT'S arbitration provision is not substantively unconscionable so as to warrant non-enforcement.**

The fact that Global and RMBT's arbitration provision requires arbitration in Oklahoma "coupled with" the fact that it provides for Global to select the arbitrator does not render the agreement to arbitrate substantively unconscionable as the district court erroneously found.   A36.   Moreover both clauses can easily be severed from the provision, while leaving in place the underlying agreement of the parties to arbitrate their disputes.

> **1.    A requirement that arbitration take place in a specific state does not render the arbitration agreement unconscionable.**

The district court acknowledged that an arbitration provision that requires that the arbitration occur in another state does not render the arbitration provision substantively unconscionable, A36, citing to another District of New Jersey case, *Thomas v. Jenny Craig, Inc.*, No. CIV.A. 10-2287 (JLL), 2010 WL 3076861, *1 (D.N.J. Aug. 4, 2010), for this exact proposition:

> Plaintiff cites to no legal authority in support of the proposition that requiring that arbitration proceedings be brought in a particular state renders the arbitration clause substantively unconscionable and, therefore, unenforceable. In any event, Jenny Craig has agreed to waive the requirement that the arbitration be conducted in California, thereby rendering this argument moot.

22672843.5

*Id.* at *9.  The district court, in pointing to the *Thomas* case on this exact issue, implicitly admits that the term requiring arbitration in Oklahoma does not render an arbitration provision substantively unconscionable.

Moreover, in *Thomas*, the district court noted the argument regarding the location of the arbitration "moot" because Jenny Craig "agreed to waive the requirement that the arbitration be conducted in California."  *Id.*  Here, Global and RMBT also agreed to waive the requirement that the arbitration be conducted in Oklahoma.  Yet, in response to Global and RMBT's waiver of the location, instead of finding the argument on this issue moot as in *Thomas,* the district court erred by following a California case, *Newton v. Am. Debt Serv., Inc.,* 854 F.Supp. 2d 712 (N.D. Cal. 2012), *aff'd* 549 Fed. Appx. 692 (9th Cir. 2013), which applied California state law on substantive unconscionability.

In applying California law, the district court stated that "the Court does not find Defendants' willingness to disclaim unconscionable provisions in the wake of this lawsuit sufficient to render an otherwise unconscionable provision conscionable."  A36.  The district court also quoted from *Newton* stating that such an offer by Global and RMBT is "suggestive [of their] intent 'to maintain a systematic effort to impose unconscionable arbitration provisions.'"  A37.  So, after citing to *Thomas* and acknowledging that this term is not in and of itself unconscionable under New Jersey law, the district court still characterizes Global

47

and RMBT's willingness to arbitrate in New Jersey as a form of ill intent.  This was error.

> ### 2.    Global's right to select the arbitrator does not render the arbitration agreement unconscionable.

As to the second (and only other) term that the district court found substantively unconscionable – *i.e.*, the term requiring that Global select the arbitrator – this term is likewise not substantively unconscionable under New Jersey law.  The district court, however, relied on two cases (one applying Kentucky state law and the other applying Colorado state law) to hold otherwise. Over and above the fact that the cases relied on by the district court do not address or discuss New Jersey law on this issue, there are additional errors made by the district court in relying on these two out-of-state cases.

The district court relied on *Davis v. Global Client Solutions, LLC*, 765 F. Supp. 2d 937 (W.D. Ky. 2011) *("Davis I")*.  A34-37.  But *Davis I* was overturned just ten months after it was entered.  The district court failed to recognize that it relied on outdated, bad law, despite Global and RMBT bringing this fact to the district court's attention in its Reply brief.  D.E.162, p.19, n.58.

*Davis I* was prior to the highly anticipated (at the time) decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011).  In fact, the opinion in *Concepcion* was issued just three months after the *Davis I*.

After *Concepcion,* the *Davis* court ordered the parties to file briefs discussing the effect of *Concepcion.* The parties complied. The *Davis* court reversed its earlier *Davis I* order and instead compelled arbitration. *Davis v. Global Client Solutions, LLC*, No. 3:10-CV-322-H, 2011 WL 4738547, at *1 (W.D. Ky. Oct. 7, 2011) *("Davis II")*. The district court, however, entirely ignores this.

*Davis II* stated the following:

First, Defendants may in fact choose an arbitrator with whom Plaintiffs are entirely satisfied. After all, Defendants' bad faith exercise of the provision would be unreasonable and grounds for an objection. On its face, the provision provides that Defendants must choose an independent and qualified arbitrator. In theory, Defendants will comply, and the clause will not result in injustice to Plaintiffs.

Second, even if Defendants choose an arbitrator that is unqualified or partial, Plaintiffs have adequate protection and available remedies. Section 5 of the FAA allows Plaintiffs to object to Defendants' appointment and ask the Court to appoint a neutral arbitrator. Should Plaintiffs not recognize that a challenge is warranted until after the arbitrator's decision, the remedial provisions of Section 10(a)(2) appear to contain additional protection. Because the clause as it is written is not unconscionable, and because the FAA adequately protects Plaintiffs, the Court rejects Plaintiffs' arguments. Having established that the Agreement's arbitration provision is not unconscionable, compliance with the FAA requires the Court to stay this action pending arbitration.

*Davis II*, 2011 WL4738547, at *4. The district court here erred in relying on *Davis I* in denying Global and RMBT's Motion to Compel Arbitration.

    **3.    Unconscionable terms may be severed from an otherwise consciable arbitration provision and Section 5 of the FAA provides for a mechanism to appoint an arbitrator.**

The district court erred when it concluded that it could not sever the terms in the arbitration provision relating to the location of the arbitration and the selection of the arbitrator. The district court, however, again relied primarily on the *Newton* case and California law for its conclusion.

In *Newton* the court was addressing California law that directs the court to evaluate the motivation for including clauses found to be unconscionable, and to reject severance if that motivation was to be oppressive. *Armendariz v. Foundation Health Psychcare Serv., Inc.,* 6 P. 3d 699 (Cal. 2000). The district court should have looked to *Pyo v. Wicked Fashions, Inc*., No. CIV09-2422 (DRD), 2010 WL1380982, at *12 (D.N.J. Mar. 31, 2010) for its severability analysis. In *Pyo*, the District of New Jersey, applying New Jersey law, only found one provision substantively unconscionable. The court in *Pyo* severed the one term and enforced the remainder of the arbitration provision.

The district court did not consider *Webster v. Freedom Debt Relief, LLC*, No. 1:10CV1587, 2011 WL3422872, at *2 (N.D. Ohio Aug. 4, 2011), another case involving the exact same arbitration clause at issue here. *Webster* found the arbitrator selection term to be unenforceable, but it still granted Global's motion to compel arbitration because the clause was severable, based on another provision in

the AADS that states: "If any part of this Agreement is declared void or unenforceable, such provisions shall be deemed severed from this Agreement. The remainder of this Agreement shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions." Global's AADS here contains the same severance language, and the district court erred in not applying it.

Under New Jersey law, the district court erred in not enforcing the underlying agreement to arbitrate. Indeed, like in *Webster*, the district court should have severed the terms and given the parties an opportunity to agree on and select an arbitrator. And, like in *Thomas*, it should have accepted Global and RMBT's waiver of the location of the arbitration.

The district court further erred in its conclusion that severance would result in an "empty agreement to arbitrate devoid of additional terms." A37, n.12. The district court relied on *Hall v. Treasure Bay Virgin Islands Corp.*, 371 Fed. Appx. 311, 314 (3d Cir. 2010).

The Third Circuit in *Hall* declined to sever any terms, and instead found the arbitration provision wholly unconscionable, because these terms evidenced a "deliberate attempt by an employer to impose an arbitration scheme that is designed to discourage an employee from arbitration or to produce results biased in the employer's favor." *Id.* The arbitration terms at issue in this case do not

51

evidence a "scheme" to discourage arbitration nor do they go to the arbitration provision's "central purpose." *Hall*, therefore, does not require that a similar result be reached in this case.

The district court also erred in discounting Section 5 of the FAA, which allows the district court to provide and substitute a mechanism for the appointment of an arbitrator. In *Khan v. Dell Inc.*, 669 F.3d 350, 354 (3d Cir. 2012), the Third Circuit ultimately concluded that the unavailability of the arbitrator named in the contract was "a breakdown in the mechanics of the appointment process" which constituted a "lapse" under Section 5. *Id.* at 356. Here, if the term regarding Global's right to select the arbitrator is severed and, so, "a breakdown of the mechanics of the appointment process" occurs, triggering the lapse clause of Section 5.

The district court does not address *Khan,* but cites *Coup v. Scottsdale Plaza Resort*, LLC, 823 F. Supp. 2d 931, 953 (D. Ariz. 2011). Yet, *Coup* contains only a simple one-line passing comment on this point and applied Arizona law. As the *Khan* case is on point and is binding legal authority in this case, it is clear that the district court erred in relying on *Coup* and in refusing to utilize Section 5.

**<u>CONCLUSION</u>**

For the foregoing reasons, it is respectfully submitted that the order under review should be reversed and remanded with directions to grant Global and RMBT's motion to compel arbitration; or, in the alternative, the order under review should be vacated and the matter remanded for an evidentiary hearing.

Respectfully submitted,

GREENSPOON MARDER, P.A.

*s/John H. Pelzer*
John H. Pelzer
(Fla. Bar No.376647)
*John.pelzer@gmlaw.com*
GREENSPOON MARDER, P.A.
200 East Broward Boulevard
Suite 1800
Ft. Lauderdale, FL 33301
954-527-2469
954-333-4069 (facsimile)

22672843.5

## <u>CERTIFICATE OF ADMISSION TO BAR</u>

I, John H. Pelzer, certify as follows:

1.     I am a member in good standing of the bar of the United State Court of Appeals for the Third Circuit.

2.     Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.


*/s/ John H. Pelzer*
John H. Pelzer

## **Certificate of Compliance With Rule 32(a)**

1.      Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

2.      This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 11,912 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

3.      This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2008 version of Microsoft Word in 14 point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection,  version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

*/s/ John H. Pelzer*_____
John H. Pelzer
Florida Bar Number 376647

Joseph Michael Pinto, Esq.
Polino and Pinto, P.C.
720 East Main Street, Suite 1C
Moorestown, NJ  08057
Counsel for Appellee

Shaji M. Eapen, Esq.
Morgan, Melhuish & Abrutyn
651 West Mount Pleasant Avenue, Suite 200
Livingston, NJ 07039-1673
Co-Counsel for Appellants,

John H. Pelzer, Esq.
Richard W. Epstein, Esq.
Greenspoon Marder, P.A.
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida  33301
Counsel for Appellants

United States Court of Appeals
21400 United States Courthouse
601 Market Street
Philadelphia, PA. 19106-1790
215.597.2995
www.ca3.uscourts.gov

# TABLE OF CONTENTS

**Page**

Opinion, Filed December 3, 2014................................................................ A1

Order, Filed December 3, 2014................................................................. A39

Notice of Appeal, Filed December 31, 2014 ......................................... A41

Docket Entries...................................................................................... A43

Class Action Complaint Seeking Monetary Damages and Injunctive
    Relief with Spoliation Notice, Filed January 28, 2011, Superior
    Court of New Jersey, Law Division, Burlington County ............. A72

Defendant, Legal Helpers Debt Resolution, LLC's Notice of
    Removal, Filed March 4, 2011 ...................................................... A119

Defendant, Legal Helpers Debt Resolution, LLC's Notice of Filing of
    Notice of Removal, Filed March 4, 2011 ..................................... A127

First Amended Class Action Complaint Seeking Monetary Damages
    and Injunctive Relief with Spoliation Notice, Filed March 17,
    2011 ............................................................................................ A129

Answer with Separate Defenses and Crossclaims on Behalf of the
    Defendants, JG Debt Solutions, L.L.C. and Joel Gavalas, Filed
    June 7, 2011, with the Following Attached Exhibits ................... A176

    Exhibit 1:  Independent Marketing Agreement ........................... A197

    Exhibit 2:  Eclipse Financial, Inc.'s Confidentiality Agreement,
        Dated September 10, 2009 ................................................. A204

    Exhibit 3:  Eclipse Financial, Inc.'s Services Agreement ............ A213

    Exhibit 4:  National Settlement Services, Debt Negotiation
        Services Agreement, Dated September 10, 2009............... A220

Answer, Separate Defenses, and Jury Demand on Behalf of
    Defendants, Stephen Chaya and Reliant Account Management,
    L.L.C., Filed July 1, 2011............................................................. A225

Global Client Solutions, LLC and Rocky Mountain Bank & Trust's
    Notice of Renewed Motion to Compel Arbitration, filed April
    4, 2014 ........................................................................................ A244

Statement of Material Facts Supporting Defendants, Global Client
    Solutions, LLC and Rocky Mountain Bank and Trust's
    Renewed Motion to Compel Arbitration, Filed April 4, 2014,
    with the Following Attached Exhibits ......................................... A247

    Exhibit A:  Excerpts of the Transcript of the Deposition
        Testimony of Dawn Guidotti, Dated November 18, 2013,
        with Exhibits........................................................................ A259

    Exhibit B: Excerpts of the Transcript of the Deposition
        Testimony of Jennifer Kelly, Dated December 9, 2013,
        with Exhibits........................................................................ A399

    Exhibit C:  Plaintiff's Responses to Request for Production of
        Documents of Global Client Solutions, L.L.C., Dated
        September 11, 2013, with Attachments .............................. A465

    Exhibit D:  Excerpts of the Transcript of the Deposition
        Testimony of Brent Hampton, Esq., Dated December 9,
        2013, with Exhibits.............................................................. A486

    Exhibit E:  Defendant, Global Client Solutions, LLC's Notice
        of Serving First Set of Interrogatories to Plaintiff, Dawn
        Guidotti, Dated September 10, 2013, and Plaintiff's
        Responses .......................................................................... A513

    Exhibit F:  Defendant, Global Client Solutions, LLC's First
        Request for Admissions to Plaintiff, Dawn Guidotti, and
        Plaintiff's Responses .......................................................... A539

    Exhibit G:  Declaration of Jennifer Kelly, Dated March 27,
        2014, with Attachments...................................................... A551

        Exhibit H:  Declaration of Brent Hampton, Esq., Dated
            March 27, 2014, with Attachments.......................... A600

    Exhibit I:  Declaration of Evan Uchida, Esq., Dated April 1,
        2014 .................................................................................... A690

Plaintiff's Appendix Submitted with Brief in Opposition to
    Defendants' Motion to Compel Arbitration, Filed May 2, 2014
    (Brief Omitted) ............................................................................ A694

Plaintiff's Response to Statement of Material Facts of Defendants,
    Global Client Solutions, LLC and Rocky Mountain Bank and
    Trust, Filed May 2, 2014 .............................................................. A1140

Plaintiff's Certified Statement of Material Facts in Opposition to
    Defendants' Motion to Compel Arbitration, Filed May 2, 2014 . A1153

Defendants, Global Client Solutions, LLC and Rocky Mountain Bank
    and Trust's  Response to Plaintiff's Certified Statement of
    Material Facts in Opposition to Defendants' Motion to Compel
    Arbitration, Filed May 30, 2014.................................................. A1174

Global Client Solutions, LLC and Rocky Mountain Bank and Trust's
    Notice of Filing Replacement Excerpt to Exhibit A (Doc. 155-
    2) in Support of Defendants' Renewed Motion to Compel
    Arbitration, Filed May 30, 2014.................................................. A1232

Declaration of Meredith H. Leonard, Esq. in Support of Global Client
    Solutions, LLC and Rocky Mountain Bank and Trust's Notice
    of Filing Replacement Excerpt to Exhibit A (Doc. 155-2) in
    support of Defendants' Renewed Motion to Compel
    Arbitration, Filed May 30, 2014, with the Following Attached
    Exhibit.......................................................................................... A1234

    Exhibit 1:  Documents Received from Plaintiff, Dawn Guidotti
        in Response to Defendants' Request for Production of
        Documents, Dated September 11, 2013 ............................. A1237

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

DAWN GUIDOTTI, on behalf of
herself and other class
members similarly situated,

              Plaintiff,

   v.

LEGAL HELPERS DEBT RESOLUTION,
L.L.C., et al.,

              Defendants.

HONORABLE JEROME B. SIMANDLE


Civil Action
No. 11-1219 (JBS/KMW)


**OPINION**

APPEARANCES:

Joseph Michael Pinto, Esq.
POLINO AND PINTO, P.C.
720 East Main Street, Suite 1C
Moorestown, NJ 08057
    Counsel for Plaintiff

Shaji M. Eapen, Esq.
MORGAN, MELHUISH & ABRUTYN, ESQS.
651 W. Mt. Pleasant Avenue, Suite 200
Livingston, NJ 07039
    and
Richard W. Epstein, Esq.
Meredith H. Leonard, Esq.
Rebecca F. Brattner, Esq.
GREENSPOON MARDER, P.A.
200 East Broward Boulevard, Suite 1500
Ft. Lauderdale, FL 33301
    Counsel for Global Client Solutions, L.L.C., Rocky Mountain
    Bank and Trust of Colorado Springs, Colorado, and Eclipse
    Servicing, Inc.

**SIMANDLE, Chief Judge:**

**I.    INTRODUCTION**

This matter comes before the Court by way of Defendant Global Client Solutions, L.L.C.'s (hereinafter, "Global") and Rocky Mountain Bank and Trust's (hereinafter, "RMBT" and, collectively, "Defendants") renewed motion to compel arbitration of Plaintiff Dawn Guidotti's (hereinafter, "Plaintiff") claims in accordance with the arbitration provision of Defendants' Account Agreement and Disclosure Statement (hereinafter, the "AADS").[1] [Docket Item 155.]

In this putative class action involving, at one time, twenty-two defendants, Plaintiff generally alleges that she contracted with various law firm and bank defendants in hopes that such entities would negotiate with creditors to settle her consumer debts without forcing Plaintiff into bankruptcy. Rather than settling her outstanding financial obligations, however, Plaintiff alleges that the various defendants conspired to fleece her (and those similarly situated) of her remaining assets, without engaging in any debt negotiations on Plaintiff's behalf.

---

[1] On June 4, 2014, Defendants moved to strike Plaintiff's statement of material facts in opposition to the pending motion. [Docket Item 164].  For the reasons stated below, Defendants' motion to strike will be granted in part and denied in part.

A2

Defendants performed a distinct function in this overall scheme, by purportedly maintaining and operating a "special bank account" out of which Plaintiff would pay the various defendants with whom Plaintiff contracted for "legal and debt negotiation" services, and into which Plaintiff would deposit funds ultimately intended "to be paid to her settling creditors." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 866 F. Supp. 2d 315, 322 (D.N.J. 2011) (citation omitted). Plaintiff's Complaint specifically identifies RMBT as the financial institution with which she opened this special purpose account, and Global as the "agent" processing the automatic fund transfers into, and/or automatic payments out of, such account. (Id.)

The Court has, on multiple occasions and in connection with various agreements, compelled Plaintiff to arbitrate her claims against certain defendants in this litigation. See, e.g., Guidotti, 866 F. Supp. 2d at 342 (granting the nine "Law Firm Defendants' motion to compel arbitration), vacated & remanded on other grounds, 716 F.3d 764 (3d Cir. 2013); Guidotti v. Legal Helpers Debt Resolution, L.L.C., No. 11-1219, 2012 WL 3262435 (D.N.J. Aug. 7, 2012) (granting the motion of defendants J.G. Debt Solutions, L.L.C. and Joel Gavalas to compel arbitration).

With respect to Defendants, however, the Court's December 20, 2011 decision concluded that Plaintiff "signed and returned"

3

A3

her Special Purpose Account Application (hereinafter, the "SPAA")—a document which referenced the AADS—prior to receiving the actual terms contained in the AADS, including its arbitration provision.  See Guidotti, 866 F. Supp. 2d at 334. Consequently, though "the SPAA clearly and unambiguously referred to the AADS" by name, the Court found that Plaintiff could not be compelled to arbitrate her claims because she lacked sufficient "knowledge of the existence of the arbitration clause or its specific conditions, even if she assented to its incorporation."  Id. at 336.

In vacating the Court's December 20, 2011 Order, the Court of Appeals found that a genuine issue of material fact precluded a summary disposition, reliant upon the pleadings, on the issue of the parties' agreement, if at all, to arbitrate.  Guidotti, 716 F.3d at 780.  The Court of Appeals specifically questioned whether Plaintiff's "unsworn claim" that the AADS did not accompany the documents indisputably received by Plaintiff in September 2009 sufficed to "outright" substantiate such assertion, particularly given Plaintiff's near-contemporaneous execution of the SPAA.  Id. at 769, 779-80. The Court of Appeals therefore remanded this action for additional evidentiary development on the validity of the agreement to arbitrate, and clarified Third Circuit law that any renewed motion to compel

A4

arbitration be entertained under the summary judgment standard of Rule 56, Fed. R. Civ. P.  Id. at 780.

Following seven months of additional factual discovery [Docket Items 146, 148, & 150], Defendants, armed with a more robust factual record, now renew their motion to compel arbitration.  [Docket Item 155.]

The principal issues presented by the pending motion are whether genuine issues of material fact exist on the parties' agreement, if at all, to arbitrate, and whether the nature of the arbitration clause renders such provision substantively and/or procedurally unconscionable.  For the reasons that follow, the Court will deny Defendants' motion to compel arbitration.[2]

## II.  BACKGROUND

### A. Rule 56.1 Statements

Plaintiff filed two statements of material fact in opposition to Defendants' motion: one identified as Plaintiff's response to Defendants' statement of material facts [Docket Item 157-2], and the other entitled Plaintiff's certified statement of material facts in opposition to Defendants' motion. [Docket Item 157-3.]

---

[2] The Court conducted oral argument on the pending motions on October 6, 2014.

5

A5

Defendants move to strike Plaintiff's certified statement of material facts on the basis that Plaintiff's statement contravenes Local Civil Rule 56.1(a) by setting forth argumentative and conclusory statements without appropriate citations to record evidence, and by impermissibly relying upon hearsay statements. (Defs.' Br. at 2-3 [Docket Item 164-1].) Defendants also argue that Plaintiff lacks personal knowledge for the vast majority of the assertions set forth in her statement, the accuracy of which Plaintiff certified under penalty of perjury. (Id. at 9-15.)

Local Civil Rule 56.1(a) generally permits the opponent of summary judgment to "furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion," to the extent necessary "to substantiate the factual basis for opposition." L. Civ. R. 56.1(a). Plaintiff's eighty-eight paragraph certified statement of material facts sets forth lengthy factual assertions, many of which lack citations to affidavits or other documents submitted in connection with Plaintiff's submission. [Docket Item 13-3.] Moreover, much of Plaintiff's supplemental statement concerns the legal relevance and weight to be afforded such facts, the inclusion of which the Court finds inappropriate in connection with a Rule 56.1(a) supplemental statement. See L. Civ. R.

6

A6

56.1(a) ("Each statement of material facts shall be a separate
document (not part of a brief) and shall not contain legal
argument or conclusions of law."). Finally, the Court agrees
with Defendants that Plaintiff's certified statement fails to
set forth verbatim recitations or accurate paraphrases of the
deposition testimony of Jennifer Kelly and Brent Hampton.
Rather, Plaintiff's certified statement clearly editorializes
such testimony. (<u>Compare, e.g.</u>, Certified Statement of Material
Facts (hereinafter, "CSMF"), ¶ 37, <u>with</u> Kelly Dep. at 34:25-
35:19.) The Court, accordingly, will grant Defendants' motion
to strike, and will disregard Plaintiff's submission to the
extent it states legal arguments or conclusions of law, and to
the extent Plaintiff failed to appropriately support her factual
assertions through record citations, contrary to Local Civil
Rule 56.1(a).

The Court need not, however, entirely disregard Plaintiff's
certified statement to the extent that such statement otherwise
comports with Local Civil Rule 56.1(a) by setting forth, in
part, substantiating citations for Plaintiff's factual
averments. Defendants' motion to strike will, therefore, be
denied to the extent Defendants urge the Court to entirely
disregard Plaintiff's certified statement. Rather, all
statements will be considered to the extent permissible under
Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1.

A7

However, to the extent either party failed to make clear any dispute of material fact in their respective Rule 56.1 statements by citing to contrary evidence in the record, the Court assumes that the opponent has no evidence raising a genuine dispute with respect to the stated fact.  The Court will therefore deem any such fact undisputed for purposes of the pending motion. See L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").  Having so concluded, the Court turns the facts of this litigation, as derived from the parties' voluminous exhibits and their 56.1 statements.

**B. Factual Background**

In September 2009, Plaintiff provided defendants JG Debt Solutions and Eclipse Financial, Inc. (hereinafter, "Eclipse") with certain non-public, personally identifying biographical and financial information, in order to determine Plaintiff's eligibility for a debt resolution program.  (Defs.' Statement of Material Facts (hereinafter, "SMF") at ¶ 1; Pl.'s Responsive Statement of Material Facts (hereinafter, "RSMF") at ¶ 1.)  In light of Plaintiff's interest in the debt resolution program, Eclipse emailed Plaintiff the relevant program documents, through the DocuSign system, on September 21, 2009.[3]  (Kelly

---

[3] For the reasons stated below, the Court rejects Defendants' assertion that Eclipse emailed the program documents directly to

Dec., Attach. 1 ("[Agreement] was emailed to DocuSign."); Kelly
Dep. at 21:1-14 (describing the DocuSign process).)  Though
Plaintiff has no recollection of receiving such documents by
email, or signing such documents through DocuSign (Giudotti Dep.
at 62:10-16), the DocuSign "Certificate of Completion" reflects
that Plaintiff received on September 21, 2009, and
electronically signed on September 22, 2009, ten documents,
including Defendants' SPAA.  (Pl.'s App., Pa000022 (DocuSign
Envelope ID: 92E83CC3-FEA5-41CD-9AE7-16FBD3A4E289, Pa000012-
Pa000021 (reflecting the same DocuSign Envelope ID).)  In the
SPAA, DocuSign'd by Plaintiff on September 22, 2009, Plaintiff
"*acknowledged*" receipt of the AADS, and further acknowledged
that the SPAA fully incorporates "by reference" the binding
terms and conditions of the AADS. (<u>Id.</u> at Pa000021 (emphasis in
original).)  In accordance with such conditions, the SPAA
authorized Defendants "to initiate" monthly "debits" from
Plaintiff's checking account in the amount of $348.68 "until
further notice."  (Pl.'s App., Pa 000021.)

   Following Plaintiff's execution of the program documents,
Joel Gavalas, the owner of defendant J.G. Debt Solutions, Inc.,
contacted Plaintiff on September 24, 2009 to confirm her
understanding of the debt settlement program, including her

---

Plaintiff, in addition to sending such documents through
DocuSign.

9

A9

special purpose account with Defendants.  (Kelly Dec., Attach.
2.)  Mr. Gavalas further directed Plaintiff to anticipate a
"Welcome package" from Legal Helpers containing "important"
documents concerning Plaintiff's obligations under the debt
resolution program.  (See id. at 14:1-14.)

On September 29, 2009, Eclipse emailed Plaintiff, through
the DocuSign system, substantively identical, but partially
revised program documents.  (Defs.' SMF at ¶¶ 12-13; Pl.'s RSMF
at ¶ 10; Pl.'s App., Pa000001; Kelly Dec., Attach. 1
("[Agreement] was emailed to Docusign.").)  Though Plaintiff
recalls receiving such documents electronically through DocuSign
on September 30, 2009 (Pl.'s RSMF at ¶¶ 12-13), she "didn't take
the time to review each page or [to] read any other documents."
(Guidotti Dep. at 63:16-20.)  Instead, she "just pointed and
clicked" on those portions of the documents that required an
electronic signature, and promptly "sent them back."  (Id.;
49:1-12; 66:6-7; 68:23-25; 69:14-23.)

The revised program documents, however, included an
identical copy of Defendants' SPAA, in which Plaintiff similarly
"*acknowledged*" receipt of the AADS, and further acknowledged
that the SPAA fully incorporates "by reference" all of the
AADS's terms and conditions. (Pl.'s App., Pa000011 (emphasis in
original).)  In accordance with such conditions, the revised
SPAA authorized Defendants "to initiate" monthly "debits" from

10

A10

Plaintiff's checking account in the revised amount of $353.62 "until further notice." (Pl.'s App., Pa000021.) Despite such terms, Plaintiff did not review the SPAA's fine print, nor did she take note of the language incorporating by reference the AADS. (Defs.' SMF at ¶ 20; Pl.'s RSMF at ¶ 20.)

In light of Plaintiff's execution of the SPAA, Global, identified by the SPAA as the "service agent" and "processor" for all activity related to Plaintiff's special purpose account (id.), mailed Plaintiff a "welcome" letter dated September 29, 2009. (Pl.'s App., Pa000024.) In the letter, receipt of which Plaintiff acknowledges (Pl.'s RSMF at ¶ 16), Global directed Plaintiff to "carefully" review the packet "in its entirety" because "it contain[ed] important information regarding [her] account." (Pl.'s App., Pa000024 (emphasis in original).) Global further stated that "detailed information" concerning Plaintiff's special purpose account could be found in the AADS appended to the welcome package. (Pl.'s App., Pa000024; Defs.' SMF, Ex. 5 to Guidotti Dep.) The appended AADS stated that it "contain[ed] the terms, conditions, and disclosures" that governed Plaintiff's special purpose account, and specifically included an Arbitration and Application of Law provision, providing that

> In the event of a dispute or claim relating in any way to [the AADS] or [Global's] services, [Plaintiff] agree[s] that such dispute shall be resolved by

binding arbitration in Tulsa[,] Oklahoma utilizing a
qualified independent arbitrator of Global's choosing.
The decision of an arbitrator will be final and
subject to enforcement in a court of competent
jurisdiction.

(Pl.'s App., Pa000026-27.)

Shortly thereafter, Legal Helpers Debt Resolution, LLC
(hereinafter, "Legal Helpers"), the debt resolution law firm
responsible for the negotiations concerning Plaintiff's
outstanding debts, mailed its own twenty-nine page "Welcome
Packet" to Plaintiff, which included, among an array of program
documents, an unexecuted version of Plaintiff's revised SPAA
(reflective of upwardly adjusted monthly debit of $353.62) and
an additional and identical copy of the incorporated AADS.
(Defs.' SMF at ¶ 22; Pl.'s RSMF at ¶ 22; Ex. 6 to Guidotti Dep.)
Plaintiff received such documents "around October 19, 2014[,]"
but again only "glanced" through the majority of the documents,
choosing instead to file the documents, without additional
review, "in the folder" containing the remainder of Plaintiff's
program "papers." (Guidotti Dep. at 84:18-86:3.)

In accordance with the SPAA and AADS, Global administered
two special purpose accounts on Plaintiff's behalf. (Defs.' SMF
at ¶ 23; Pl.'s RSMF at ¶ 23; Pl.'s App., Pa000383-395.) The
initial transfers into Plaintiff's accounts, however, did not
occur until December 30, 2009, at which time Global transferred
(in accordance with the SPAA) $120.34 from Plaintiff's personal

12

A12

bank account into Plaintiff's initial special purpose account (Defs.' SMF at ¶ 25; Pl.'s RSMF at ¶ 25; Pl.'s App., Pa000383), an amount similarly transferred into Plaintiff's second special purpose account on March 22, 2010.[4]  (Defs.' SMF at ¶ 25.)

"Somewhere around" February 2010, Plaintiff then received a follow-up "welcome" packet from Global dated February 3, 2010. (Guidotti Dep. at 97:8-15; Pl.'s App., Pa000057.)  In this welcome package, Global again advised Plaintiff to pay "careful[]" attention to the "detailed information" concerning her special purpose accounts, and directed Plaintiff, in particular, to review the AADS appended to Global's correspondence.  (Pl.'s App., Pa000057.)  Upon receipt of Global's "welcome" letter, Plaintiff "[g]lanced at the front page and put it in [her program] folder."  (Guidotti Dep. at 97:16-18.)

---

[4] The Court rejects Plaintiff's assertion that the first relevant transfer under the SPAA occurred on October 2, 2009, at which time Legal Helpers debited the sum of $461.05 from Plaintiff's personal bank account.  (See Pl.'s Opp'n at 15; Pl.'s App., Pa000437.)  The SPAA, on its face, only concerns Global's authorization to deduct certain sums from Plaintiff's personal bank account.  (See, e.g., Pl.'s App., PA000021 (authoring RMBT, "through its agent Global, to initiate debt entries").)  The Legal Helpers' retainer agreement, by contrast, authorizes Legal Helpers to initiate separate deductions from Plaintiff's personal bank account for "all legal fees and service costs[.]"  (Id. at Pa000042.)  The October 2, 2009 deduction clearly occurred in accordance with the retainer agreement, not the SPAA.  (See PA000440 (reflecting an "ACH Debit" by "GCS" in the amount of $120.34 and a separate "ACH Debit" by "Legal Helper's" in the amount of $233.28).)

A13

On February 4, 2010, Global commenced regular fund
transfers (in the amount of $353.62 per month) from Plaintiff's
personal bank account into her special purpose account. (Defs.'
SMF at ¶ 27.) Plaintiff's participation in the program
continued throughout the remainder of that year, during which
time Plaintiff received, by mail, monthly account statements
from Global. (Ex. 9 to Guidotti Dep.) In early 2011, however,
Plaintiff closed her special purpose accounts with Defendants
and Global, accordingly, remitted the balance of her accounts in
March 2011. (Pl.'s RSMF at ¶¶ 30-31; Ex. 13 to Guidotti Dep.)

**C. Procedural History**

Defendants removed this action from the Superior Court of
New Jersey, Burlington County, on March 3, 2011. [Docket Item
1.] Plaintiff thereafter filed an Amended Complaint in this
federal litigation on March 17, 2011. [Docket Item 4.] In her
Amended Class Action Complaint, Plaintiff generally alleges that
Defendants defrauded Plaintiff, and those similarly situated, by
advertising, marketing, and performing "unlawful" debt
adjustment and negotiation services, and by "engaging in the
unauthorized practice of law in the State of New Jersey."
(First Am. Class Compl. [Docket Item 4], 2, 10.)

In lieu of an answer, Defendants filed their initial motion
to compel arbitration on May 23, 2011. [Docket Item 27.] In
their initial motion, as here, Defendants argued that the

"unequivocal" language of the AADS, including its "valid and enforceable" arbitration provision, required that Plaintiff "be compelled to arbitration." (Defs.' Br. [Docket Item 27-1], 7-8.) Plaintiff, however, asserted in opposition that she never agreed to arbitrate disputes between herself and Defendants, particularly because Plaintiff did not receive the AADS prior to executing the SPAA, and because the SPAA's incorporation of the AADS "did not have a reasonably clear and ascertainable meaning." (Pl.'s Opp'n [Docket Item 48], 27-28.)

In the Court's December 20, 2011 decision denying Defendants' initial motion, the Court found the record sufficient to conclude that Defendants' initial collection of documents did not include the AADS. Guidotti, 866 F. Supp. 2d at 333. The Court therefore determined that the formation of the parties' contractual relationship (through Plaintiff's electronic signature on the SPAA) occurred prior to Plaintiff's receipt of the AADS, including its arbitration clause. Id. at 334. In addition, the Court found, in reliance upon Alpert v. Goldberg, 983 A.2d 604 (N.J. Super. Ct. App. Div. 2009), the AADS "not properly incorporated into the SPAA," because Plaintiff, "the party to be bound," had neither knowledge of the existence of the arbitration clause, nor possession of its specific provisions. Id. at 336. Consequently, because the SPAA failed to properly incorporate the AADS, the Court

15

A15

concluded that such provision could not compel Plaintiff to arbitrate.  Id.

On January 17, 2012, Defendants filed a notice of appeal pursuant to Section 16 of the Federal Arbitration Act (hereinafter, the "FAA") [Docket Item 104], and the Court thereafter granted Defendants' motion to stay the litigation as to them pending disposition of their appeal.  [Docket Items 137 & 138.]  On May 28, 2013, the Court of Appeals found the record "insufficient" to demonstrate the absence of issues of fact concerning whether the parties' agreed to arbitrate.  Guidotti, 716 F.3d at 767, 780.  In so holding, the Court of Appeals acknowledged its "inconsistent pronouncements" concerning the standard governing motions to compel arbitration, and therefore endeavored, through its Opinion, "to clarify the standards to be applied to such motions, and the circumstances" under which district courts should apply the standards for a motion to dismiss, Rule 12(b)(6), Fed. R. Civ. P., as opposed to the standard for summary judgment found in Rule 56, Fed. R. Civ. P. Guidotti, 716 F.3d at 767, 773.

In that regard, the Court of Appeals articulated a spectrum.  Specifically, in "light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate[,]" the court determined that a motion to compel

16

A16

arbitration should only be considered "'without the inherent delay of discovery'" under a Rule 12(b)(6) standard, where the face of the complaint (or the documents relied upon in the complaint) demonstrates, with sufficient clarity, the parties' agreement to arbitrate. <u>Guidotti</u>, 716 F.3d at 774-75 (citation omitted). Where, however, arbitrability is not apparent on the face of the complaint, or where the non-movant proffers "enough evidence" to place the validity of arbitration agreement in issue, the Court of Appeals concluded that "a 'restricted inquiry into factual issues' will be necessary to properly evaluate" the presence, if at all, of "a meeting of the minds on the agreement to arbitrate[.]" <u>Id.</u> at 775.

Here, the Court of Appeals found it "significant" that neither party was able to furnish a copy of the AADS reflecting Plaintiff's electronic signature and, accordingly, concluded that Plaintiff proffered "enough evidence" in opposition to Defendants' motion to "trigger the application of the summary judgment standard" to the issue of arbitration. <u>Id.</u> at 779. The Court of Appeals therefore found a Rule 12(b)(6) inquiry too restrictive in its ability to account for Plaintiff's proffer, because "no reading" of Plaintiff's Complaint, taken solely on its face, "could rightly relieve" Plaintiff of the binding arbitration provision of the AADS. <u>Id.</u> at 778. Mindful of the controverted evidence, the Court of Appeals concluded that the

17

A17

Court should have, prior to resolving the initial motion, permitted "limited discovery" and entertained the initial motion under a summary judgment standard and, accordingly, remanded the matter for such consideration.  Id. at 780.

In accordance with the Court of Appeal's mandate, the parties engaged in seven months of limited factual discovery [Docket Items 146, 148, & 150], and the pending, renewed motion to compel arbitration followed.

## III. STANDARD OF REVIEW

Here, the Court must, in accordance with Federal Rule of Civil Procedure 56, delve into "a 'restricted inquiry into factual issues'" in order to determine whether the parties engaged in a meeting of the minds on an agreement to arbitrate. Guidotti, 716 F.3d at 774 (citation omitted).  The Court will, accordingly, only grant Defendants' motion to compel arbitration if the Court finds no genuine factual dispute as to the validity of the agreement.  Fed. R. Civ. P. 56(a). In so considering, the Court must view the evidence in the light most favorable to Plaintiff, and must provide Plaintiff with the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).

18

A18

**IV.  Discussion**

**D. Federal Arbitration Act, 9 U.S.C. §§ 1-16**

The FAA directs courts to compel arbitration of claims arising out of a valid agreement to arbitrate and reflects "the national policy favoring arbitration agreements." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006).  Indeed, the FAA makes such agreements "'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  AT&T Mobility LLC v. Concepcion, 131 S.Ct. 1740, 1744 (quoting 9 U.S.C. § 2).

The preference for arbitration, however, is not without limits.  Rather, because arbitration constitutes "'a matter of contract between the parties,' a judicial mandate to arbitrate must be predicated upon the parties' consent." Guidotti, 716 F.3d at 771 (quoting Par-Knit Mills, Inc., 636 F.2d at 54).

Consequently, in order to compel arbitration, the Court must therefore engage in a two-step inquiry into whether: "(1) a valid agreement to arbitrate exists, and [whether] (2) the particular disputes falls within the scope of that agreement." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (citing Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005)).

19

A19

**E.  State Law Contract Principles**

In determining whether the parties entered into a valid agreement to arbitrate, courts "turn to 'ordinary state law principles that govern the formation of contracts.'"  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009) (quoting First Options of Chic., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).  Consequently, the Court notes that New Jersey courts have long favored arbitration as a means of resolving disputes and are guided by the national policy and State interest preferring arbitration when interpreting such agreements.[5]  Delta Funding Corp. v. Harris, 912 A.2d 104, 110 (N.J. 2006); Martindale v. Sandvik, Inc., 800 A.2d 872, 877 (N.J. 2002).  "Arbitration's favored status does not mean that every arbitration clause, however phrased, will be enforceable." Atalese v. U.S. Legal Servs. Grp., L.P., 99 A.3d 306, 312 (N.J. 2014).  Rather, an "agreement to arbitrate, like any other contract, 'must be the product of mutual assent,'" and "requires 'a meeting of the minds.'"  Id. at 312-13 (citations omitted). Mutual assent to arbitrate, in turn, requires that the parties have full knowledge and "understanding of the terms to which

---

[5] On the record on November 6, 2014, the parties conceded that New Jersey law applies for the purposes of the pending motion to compel arbitration.

A20

they have agreed." <u>Atalese</u>, 99 A.3d at 313.  Indeed, the New

Jersey Supreme Court has explained:

> In respect of specific contractual language, "[a]
> clause depriving a citizen of access to the courts
> should clearly state its purpose. The point is to
> assure that the parties know that in electing
> arbitration as the exclusive remedy, they are waiving
> their time-honored right to sue. [<u>Marchak v. Claridge</u>
> <u>Commons, Inc.</u>, 633 A.2d 531, 535 (N.J. 1993)]. As we
> have stressed in other contexts, a party's waiver of
> statutory rights "must be clearly and unmistakably
> established, and contractual language alleged to
> constitute a waiver will not be read expansively."
> [<u>Red Bank Reg'l Educ. Ass'n v. Red Bank Reg'l High</u>
> <u>Sch. Bd. Of Educ.</u>, 393 A.2d 267, 276 (N.J. 1978)].

<u>Garfinkel v. Moga</u>, 773 A.2d 665, 670 (N.J. 2001).

### F. The AADS Fails to Constitute a Valid Agreement to Arbitrate

Defendants' arguments concerning the validity of the AADS

as a binding agreement to arbitrate are threefold: first,

Defendants argue that Plaintiff received the AADS in connection

with Plaintiff's initial and/or revised SPAA; additionally, and

in the alternative, Defendants assert that the SPAA lawfully

incorporated the AADS; and finally, Defendants argue that

Plaintiff manifested assent to the AADS through her continued

use of her special purpose account.

The Court readily dispenses with Defendants' first and

second arguments, because factual disputes clearly preclude a

finding in Defendants' favor on the question of whether the AADS

accompanied the various initial collections of documents.

A21

Notably, though the record well-documents Defendants'

transmission of the SPAA through the DocuSign system, Defendants

have produced no evidence similarly reflecting Plaintiff's near

contemporaneous receipt of such documents by direct email.

Moreover, neither the deposition testimony nor the purportedly

contemporaneous file notes dispel any doubt concerning

Plaintiff's receipt of the AADS by separate email.[6]   The Court

_____

[6] The Court therefore rejects Defendants' assertion that New
Jersey law deems the SPAA and the AADS a single contract,
regardless of whether the AADS accompanied the SPPA, or even
whether Plaintiff ever received the AADS. (Defs.' Br. at 27
(citations omitted).)   Though New Jersey law recognizes that
"two or more writings may constitute a single contract even
though they do not refer to each other[,]" whether such writings
are to be construed as a single contract depends solely upon the
parties' intent. Van Orman v. Am. Ins. Co., 680 F.2d 301, 306
(3d Cir. 1982); see also Lawrence v. Tandy & Allen, 100 A.2d
891, 894-95 (N.J. 1953) (same). Defendants have not demonstrated
such intent in this instance.   Nor is the Court persuaded by
Defendants' reliance upon N.J. MetroMall Urban Renewal Inc. v.
City of Elizabeth, 26 N.J. Tax 276 (N.J. Tax 2003), Carfagno v.
Ace, Ltd., No. 04-6183, 2005 WL 1523530 (D.N.J. June 28, 2005),
and Days Inn Worldwide, Inc. v. Prudent Lodging of Kalamazoo,
LLC, No. 11-2493, 2011 WL 3329526 (D.N.J. Aug 1, 2011).   In all
three cases, the courts generally found the defendants' failures
to provide the precise arbitration provisions in connection with
the initial agreements insignificant to the issue of enforcing
such provisions, given the initial agreements' "clear and
unambiguous" reference to "final and binding" arbitration.
Carfago, 2005 WL 1523530, *10 (finding "no merit to the
argument" that an arbitration clause "should be held invalid
because the arbitration policy was not made available to each of
the four [plaintiffs] before signing" their employment
agreement, given the employment agreement's "clear and
unambiguous language" that any dispute "would be resolved
'EXCLUSIVELY' through final and binding arbitration"); Days Inn,
2011 WL 3329526, at *2 (finding plaintiff's allegation that he
"'never saw'" the license agreement insufficient to excuse
performance, given the guaranty agreement's "explicit reference

A22

similarly rejects, principally for the unaltered reasons stated
in the Court's December 20, 2011 Opinion, Defendants'
alternative argument concerning the sufficiency of the SPAA's
incorporation of the AADS.  Rather, genuine issues of fact
clearly persist concerning whether Plaintiff had the AADS at the
time she signed the SPAA, and it is axiomatic that an agreement
cannot be found properly incorporated, if the provisions of such
agreement are not known by the party to be bound at the time of
acknowledgment.[7]  <u>Alpert, Goldberg, Butler, Norton & Weiss, P.C.</u>

---

to specific sections of the" license agreement); <u>N.J. Metromall</u>,
22 N.J. Tax at 286 (reading multiple contracts in unison, in
light of a clear "understanding by the parties" in support of
such construction).  The SPAA, by contrast, contains no
similarly clear and unambiguous reference.  (<u>See, e.g.</u>, Pl.'s
App., Pa000011.)  Nor is there any support for counsel for
Defendants' assertion that the SPAA constituted an application,
rather than an agreement.  Indeed, the SPAA, by its very terms,
indicates that it serves as the Agreement between the parties,
and Plaintiff executed no other documents in connection with the
serviced rendered by Defendants.  (<u>See, e.g.</u>, Pl.'s App.,
Pa000021 (noting that Plaintiff applied for "and agree[d] to
establish a special purpose account" with Defendants, and
further acknowledged that such "Application is subject to
[Defendants'] customer identification program, as required [by]
the USA Patriot Act and other applicable laws").)

[7] Nor does the Court agree with Defendants' reliance upon <u>Willis
v. Debt Care USA, Inc.</u>, No. 11-430, 2012 WL 5844695 (D. Or. Nov.
19, 2012).  In <u>Willis</u>, under facts similar to this litigation,
the district court considered whether a substantively identical
SPAA properly incorporated the AADS's arbitration provision.
<u>Id.</u> at *4.  In finding proper incorporation, the district court
stated, citing Oregon law, that it could locate no authority
that prohibited incorporation of another writing solely because
"the other writing [was] not simultaneously delivered[.]"  <u>Id.</u>
Such finding, however, occurred after a "'summary [bench]
trial'" on the issue of whether the parties agreed to arbitrate,
not in the context of a summary judgment motion.  <u>Id.</u> at *1.

23

A23

v. Quinn, 983 A.2d 604, 617 (N.J. Super. Ct. App. Div. 2009);[8]
see also Nova Corp. v. Joseph Stadelmann Elec. Contractors,
Inc., No. 07-1104, 2008 WL 746672, at *3 (D.N.J. Mar. 18, 2008)
("'Incorporation by reference is proper where the underlying
contract makes clear reference to a separate document, the
identity of the separate document may be ascertained, and
incorporation of the document will not result in surprise or
hardship.'") (citations omitted).  Affording Plaintiff the
benefit of all reasonable inferences, and given the demonstrable
absence of clear evidence, the Court finds these arguments
without merit.

     Moreover, even if the Court assumed that Plaintiff received
the AADS and/or that the SPAA sufficiently incorporated the
AADS, the Court concludes that the arbitration provision of the
AADS fails, on its face, for two reasons.  First, the Court
finds the provision's failure to contain a clear expression of a

---

Moreover, the law in New Jersey, as illustrated by Alpert,
clearly differs in material respects and, in any event, an
unpublished decision from another district (applying another
state's law) does not constitute binding authority on this
Court.

[8] In addition to recapitulating their arguments concerning the
purportedly distinguishable features of Alpert, Defendants argue
that the standard applicable to the pending motion, as opposed
to the standard applied to the initial motion, dictates a
contrary conclusion.  (Defs.' Br. at 28 n.115.) The Court's
legal interpretation of Alpert remains unaltered regardless of
the standard of review applicable to the pending motion, and no
amount of discovery could affect the Court's construction of
Alpert's crystalline language concerning New Jersey's law of
incorporation by reference.  See Alpert, 983 A.2d at 617-18.

24

A24

waiver of rights nullifies any mutual assent that Plaintiff may otherwise have manifested.  Second, the Court finds the terms of such provision substantively unconscionable and, therefore, unenforceable.  For these reasons, the Court also rejects Defendants' third argument.

### 1. The AADS Lacks the Clarity Required under New Jersey State Law

Defendants argue that Plaintiff's continued use of her special purpose account upon receipt of the AADS amply reflected Plaintiff's assent to the AADS's provisions.  (See Defs.' Reply at 11-14.)  Plaintiff counters, however, that the arbitrative provision fails to contain clear and unambiguous language concerning Plaintiff's waiver of her right to sue.  (See Pl.'s Ltr. Br. at 2.)  In that regard, the Court finds Atalese v. U.S. Legal Services Group, L.P., 99 A.3d 306, 312 (N.J. 2014) instructive.

In Atalese, plaintiff, an individual consumer, contracted with defendant for debt-adjustment services.  Id. at 309.  The parties' agreement contained an arbitration provision for the resolution of any dispute arising out of the agreement, but, as here, nowhere indicated that such provision waived plaintiff's statutory right to seek court relief.  Id.  In her civil complaint, plaintiff alleged that defendant violated New Jersey's Consumer Fraud, N.J.S.A. §§ 56:8-1 to -20, and Truth-

25

in-Consumer Contract, Warranty and Notice, N.J.S.A. §§ 56:12-14 to -18, Acts, by promising to negotiate with all of plaintiff's creditors, but settling instead "only a single debt" in exchange for an approximately $5,000 fee.  Id.  Defendant, relying upon the arbitration provision in the parties' service contract, moved to compel arbitration.  Id. at 310.  The Superior Court of New Jersey found the provision "'minimally'" sufficient to put plaintiff on notice of the arbitration requirement, and compelled arbitration.  The New Jersey Appellate Division affirmed, finding the arbitration clause provided the "'parties reasonable notice of the requirement to arbitrate all claims under the contract," and that "a reasonable person, by signing the agreement, [would have understood] that arbitration is the sole means of resolving contractual disputes.'"  Id. at 311.

The New Jersey Supreme Court, however, reversed, finding the language of the service agreement insufficient to "clearly and unambiguously signal to plaintiff" that, by executing the arbitration provision, she surrendered "her right to pursue her statutory claims in court."  Id. at 316.  Indeed, the clause merely stated that either party may submit any dispute to "'binding arbitration,'" but provided no explanation concerning arbitration, nor language, sufficiently plain, to advise plaintiff that such provision relinquished her right to sue or otherwise secure court relief.  Id. at 315.

Rather, the Atalese court stated that an enforceable waiver-of-rights clause requires a clear and unmistakable expression that the provision waives the individual's time-honored right to sue.  Id. at 314.  In so holding, the Court noted that "[n]o particular form of words" accomplish the requisite "clear and unambiguous" waiver of rights, but concluded that arbitration clauses—and other contractual clauses—pass muster only when phrased in language understandable to the reasonable consumer.  Id.

In addition, the Atalese court recognized the FAA's prohibition against a state subjecting an "'arbitration agreement to more burdensome requirements than'" other contractual provisions, but stressed that a clarity requirement in contractual language fails to constitute a requirement "specific to arbitration provisions."  Id. at 312-13.  Rather, the court noted that New Jersey contract law requires, overall, that any waiver-of-rights provisions "'be clearly and unmistakably established.'"  Id. at 313-15 (quoting Garfinkel, 773 A.2d at 670).  The court therefore emphasized that its decision imposed "no greater burden on an arbitration agreement than any other agreement waiving constitutional or statutory rights."  Id. at 316.

27

A27

Application of the sensible and binding contract principles enunciated in Atalese compel a clear conclusion in this instance: the arbitration provision of the AADS fails. Indeed, as in Atalese, the arbitration provision requires Plaintiff to submit to binding arbitration, but provides no clear and unequivocal indication that such provision waives Plaintiff's right to seek relief in Court. (See, e.g., (Pl.'s App., Pa000026-27.) Indeed, the provision nowhere references that it effectuates a waiver of Plaintiff's right to sue. (Id.) Moreover, the clause provides no explanation concerning the nature of an arbitration proceeding, nor an indication concerning how arbitration differs from a traditional court proceeding. (Id.) Rather, in fine print on the second page of a substantively dense document, the arbitration provision obligates, without explanation, resolution by arbitration of all disputes. (Id.) Such provision, however, plainly fails to advise Plaintiff of its effect, namely, that it bars her from seeking court relief. Such failure nullifies any mutual assent that may have otherwise been manifested by Plaintiff with respect to the AADS. See Atalese, 99 A.3d at 316 ("Mutual assent to an agreement requires mutual understanding of its terms.") Indeed, "'[a]n effective waiver requires a [consumer] to have full knowledge of [her] legal rights'" before she relinquishes them, and Plaintiff could not, given the language

28

A28

of the provision, have had such knowledge in this instance.  Id. (citation omitted).

In so concluding, the Court rejects Defendants' assertion that the FAA preempts the application of the Atalese rule.  (See Defs.' Ltr. Br. [Docket Item 171].)  In AT&T Mobility LLC v. Concepcion, 131 S.Ct 1740 (2011), the Supreme Court noted that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses.'"  Id. at 1746 (citation omitted).  The FAA, accordingly, permits states to regulate arbitration agreements in accordance with general contract principles, and to invalidate such provisions "upon such grounds as exist at law or in equity for the revocation of any contract.'" 9 U.S.C. § 2.  The FAA, however, preempts state-based defenses that apply only to arbitration, "that derive their meaning from the fact" that they arise in connection with an agreement to arbitration, and/or that, in practice, disproportionately impact arbitration agreements.  Concepcion, 131 S.Ct. at 1746-47.

The Atalese rule, by contrast, results in no such effect. Indeed, the Atalese court specifically noted that New Jersey contract law "repeatedly" recognizes that a waiver of rights, in whatever contractual context, requires a clear and unmistakable expression.  Atalese, 99 A.3d at 314.  In so holding, the New Jersey Supreme Court relied upon an array of jurisprudence in

29

contexts unconnected with arbitration, in order to demonstrate that then-existing New Jersey Law required that an effective waiver of rights, in whatever context, be plainly expressed.[9] See, e.g., id. at 313-14. Moreover, application of the Atalese rule does not uniquely disfavor or disproportionately impact arbitration. Rather, it requires that a consumer contract's provision waiving rights, including an agreement to arbitrate, be stated in sufficiently clear terms and, if so stated, permits courts to compel arbitration. The Court therefore finds Atalese consistent with the FAA, as construed by the Supreme Court in Concepcion, and, accordingly, follows its rationale in this instance.

Moreover, even if the Court found Atalese preempted by the FAA, the Court would still find, as stated below, the arbitration provision of the AADS substantively unconscionable. See Concepcion, 131 S.Ct. at 1746 (noting that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by

---

[9] The Court therefore finds Defendants' reliance upon Mortensen v. Bresnan Communications, LLC, 722 F.3d 1151 (9th Cir. 2013), unpersuasive. In Mortensen, the Ninth Circuit found Montana's "reasonable expectations/fundamental rights rule" preempted by the FAA, because such rule specifically "arose from state court consideration of adhesive arbitration agreements," and because the rule applied, in primary part, only to such agreements. Id. at 1161. In articulating the Atalese rule, by contrast, the New Jersey Supreme Court relied upon existing New Jersey law that arose in contexts separate and distinct from arbitration. Atalese, 99 A.3d at 313-14 (citing cases, among others, in the labor-relations, licensing, and Condominium Act contexts)

A30

"'generally applicable contract defenses, such as fraud, duress,
or <u>unconscionability</u>'") (emphasis added).

> **2. The Arbitration Provision is Substantively Unconscionable to the Extent it Enables Defendants to Exercise Complete Control over the Arbitration Process**

Defendants' submissions give short shrift to the issue of
unconscionability.  (Defs.' Br. at 32-34; Defs.' Reply at 15.)
Rather, Defendants primarily argue, in reliance upon <u>Spinetti v.
Serv. Corp. Int'l</u>, 324 F.3d 212 (3d Cir. 2003), that the Court
should "simply sever" any unconscionable terms, while enforcing
"the remainder of the arbitration agreement."  (Defs.' Br. at
34.)  Plaintiff, by contrast, argues, in reliance upon <u>Newton v.
Am. Debt Servs.</u>, 549 F. App'x 692 (9th Cir. 2013), that the
arbitration provision must fail as unconscionable.[10]  (Pls.'
Opp'n at 23-31.)

For the most part, unconscionability under New Jersey law
looks for "'two factors: (1) unfairness in the formation of the

---

[10] Plaintiff's arguments concerning unconscionability pertain, in
primary part, to the specific arbitration provision of the AADS.
(<u>See</u> <u>generally</u> Defs.' Br. at 23-31.)  Because substantive
federal arbitration law views arbitration provisions as
"severable from the remainder of the contract[,]" <u>Buckeye Check
Cashing, Inc.</u>, 546 U.S. at 445-46, the Court need not address
any other elements of the AADS, because the Court's disposition
of the pending motion renders unnecessary any inquiry into the
AADS's "Limitation of Liability" and "Attorneys Fees and Costs"
provisions.  The Court notes, however, that <u>Newton</u> found such
provisions substantively unconscionable.  594 F. App'x at 694.

31

A31

contract, and (2) excessively disproportionate terms.'"[11]
Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc., 357 F.
Supp. 2d 788, 801 (D.N.J. 2005) (quoting Sitogum Holdings, Inc.
v. Ropes, 800 A.2d 915, 921 (N.J. Super. Ct. Ch. Div. 2002)
(citations omitted)).  The first factor—procedural
unconscionability—considers defects in the formation, namely,
the parties' "age, literacy, lack of sophistication," and the
presence of "hidden or unduly complex contract terms, bargaining
tactics, and the particular setting existing during the contract
formation process."  Id.  The second factor—substantive
unconscionability—simply suggests "the exchange of obligations
so one-sided as to shock the court's conscience."  Sitogum
Holdings, Inc., 800 A.2d at 921.  In the event an analysis of
such factors dictates unconscionability, courts have broad
discretion to fashion an appropriate remedy.  See Pyo v. Wicked
Fashions, Inc., No. 09-2422, 2010 WL 1380982, at *4 (D.N.J. Mar.
31, 2010).  The court may, for example, deem the agreement
unenforceable in its entirety, may strike the unconscionable

---

[11] In somewhat parallel fashion, New Jersey law directs a court,
in determining whether to enforce the terms of a contract of
adhesion, to look "'not only to the take-it-or-leave-it nature
or the standardized form of the document but also to the subject
matter of the contract, the parties' relative bargaining
positions, the degree of economic compulsion motivating the
'adhering' party, and the public interests affected by the
contract.'"  Muhammad v. Cnty. Bank of Rehoboth Beach, Del., 912
A.2d 88, 97 (N.J. 2006) (quoting Rudbart v. North Jersey Dist.
Water Supply Comm'n, 605 A.2d 681, 687 (N.J. 1992)).

provision and enforce the remainder of the agreement, or may limit the application of the unconscionable provision in order to avoid an unconscionable result. See id. (citing N.J.S.A. § 12A:2-302). Moreover, the Court may under Section 5 of the FAA, "designate and appoint an arbitrator" under certain conditions. 9 U.S.C. § 5

In arguing that the arbitration provision of the AADS fails as procedurally unconscionable, Plaintiff asserts that her unequal "bargaining position" resulted in a provision of adhesion. (Pl.'s Opp'n at 28-29.) The Court finds these arguments unpersuasive. While a disparity in bargaining power clearly exists between the parties (one being a sophisticated nationwide business and the other a private individual consumer), such disparity will not alone render a contract unconscionable. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991) (finding "[m]ere inequality in bargaining power" insufficient, without more, to find arbitration agreements unenforceable). New Jersey courts similarly conclude that a contract need not be found unenforceable solely because of its purportedly adhesive nature. Gras, 786 A.2d at 889 (noting that, "the mere fact that a contract is adhesive does not render it unenforceable"). Moreover, Plaintiff has not shown economic compulsion in the formation of the contract.

33

A33

Rather, the record reflects that Plaintiff contracted with Defendants on her volition.  (See Pl.'s RSMF at ¶¶ 1-4.)

Nor did Defendants leave Plaintiff without option in agreeing to be bound by the arbitration provision of the AADS. To the contrary, Defendants (ultimately) afforded Plaintiff the opportunity to review the plain language of such provision, and specifically enabled Plaintiff to terminate the agreement, without penalty, "at any time" by providing the required written notice.  (Pl.'s App., PA000026.)  Given the strong presumption of the enforceability of arbitration agreements, and the absence of unfair circumstances, the Court does not find the arbitration provision of the AADS procedurally unconscionable.  See Ohai v. Verizon Commc'ns., Inc., No. 05-729, 2005 WL 6563176, at *5 (D.N.J. Oct. 28, 2005) (finding an arbitration clause not procedurally unconscionable, despite its adhesive nature, and the parties' "unequal bargaining power").

In arguing substantive unconscionability, Plaintiff argues that the Court should follow the rationales set forth in Newton v. Am. Debt Servs., 549 F. App'x 692 (9th Cir. 2013) and Davis v. Global Client Solutions, LLC, 765 F. Supp. 2d 937 (W.D. Ky. 2011), both of which found the AADS's arbitration provision substantively unconscionable.  (Defs.' Br. at 29.)  The Court agrees.

34

A34

In <u>Newton</u>, a case involving the same Defendants, the Ninth Circuit found the AADS's arbitration clause substantively unconscionable on four bases, two of which directly relate to this litigation.  594 F. App'x at 694.  The <u>Newton</u> court specifically found that, "the arbitration forum provision require[d] [plaintiff], who reside[d] in [another state], to arbitrate in Tulsa, Oklahoma—Global Client Solutions'[] headquarters" and "reserve[d] the selection of an arbitrator solely to Defendants."  <u>Id.</u> (internal citations omitted).  In <u>Davis</u>, another case involving the same Defendants, the district court found the AADS's arbitration provision substantively unconscionable because it served as a "substantive waiver" of plaintiffs' rights to pursue all available remedies, and because it provided Defendants the sole right to select an appropriate arbitrator.  765 F. Supp. 2d at 942.

The disputed arbitration provision in this instance contains aspects identical to those found unconscionable in <u>Newton</u> and <u>Davis</u>.  The arbitration provision specifically provides that

> In the event of a dispute or claim relating in any way to this Agreement or our services, you agree that such dispute shall be resolved by binding arbitration in <u>Tulsa[,] Oklahoma</u> utilizing a qualified independent arbitrator <u>of Global's choosing</u>. The decision of an arbitrator will be final and subject to enforcement in a court of competent jurisdiction.

(Pl.'s App., Pa000027 (emphasis added).)  Here, as in Newton and Davis, the Court finds that the arbitration provision fails for two reasons.  First, the arbitration clause requires that Plaintiff arbitrate her claims in Tulsa, Oklahoma, the home of Defendants' headquarters, thereby providing Defendants an unfair advantage at Plaintiff's expense.  See Newton v. Am. Debt Servs., Inc., 854 F. Supp. 2d 712, 726 (N.D. Cal. 2012), aff'd, 549 F. App'x 692.  Second, the arbitration clause gives Defendants the unilateral right to select the "qualified independent arbitrator[.]" (Pl.'s App., Pa000027.)  Even if the first infirmity, the inconvenience of the designated forum for arbitration, fails, by itself, to render the arbitration clause substantively unconscionable, see Thomas v. Jenny Craig, Ing., No. 10-2287, 2010 WL 3076861 (D.N.J. Aug. 4, 2010), when coupled with the second infirmity, the ability to solely select the purportedly independent arbitrator, the arbitration provision enables Defendants to exercise complete control over the arbitration process.  For that reason, the Court finds the arbitration provision so one-sided as to be substantively unconscionable.

Moreover, the Court does not find Defendants' willingness to disclaim unconscionable provisions in the wake of this lawsuit sufficient to render an otherwise unconscionable provision conscionable.  Rather, as in Newton, the Court finds

36

A36

any such offer suggestive of Defendants' intent "to maintain a
systematic effort to impose unconscionable arbitration
provisions." 854 F. Supp. 2d at 727. The Court therefore
follows <u>Newton</u> and <u>Davis</u>, and likewise finds Defendants'
arbitration provision substantively unconscionable and,
therefore, unenforceable.[12]

---

[12] Given the pervasive nature of arbitration provision's
unconscionable elements (two of the three sentences), the Court
cannot, reasonably, sever only those offending portions, for
doing so would leave only "a mere agreement to arbitrate," and
would entail an extensive reformation of the arbitration
agreement. <u>Newton</u>, 549 F. App'x at 695 (affirming the district
court's choice not to sever unconscionable portions of an
arbitration agreement); <u>see also</u> <u>Hall v. Treasure Bay Virgin
Islands Corp.</u>, 371 F. App'x 311, 314 (3d Cir. 2010) (finding
severance inappropriate where "unconscionable provisions
'permeate the agreement'" and affirming the district court's
decision finding the entire arbitration agreement
unenforceable). Moreover, Section 5 of the FAA does not revive
an otherwise unconscionable arbitration provision. Rather, it
envisions the designation of an appropriate arbitrator only in
the event that an otherwise enforceable arbitration provision
fails to so designate. <u>See</u> 9 U.S.C. § 5; <u>Coup v. Scottsdale
Plaza Resort LLC</u>, 823 F. Supp. 2d 931, 953 (D. Ariz. 2011)
(rejecting defendants' argument that the court's ability to
appoint an arbitrator under Section 5 sufficed, by itself, to
overcome plaintiffs' arguments concerning substantive
unconscionability). Here, even if the Court appointed such an
arbitrator, the parties would still be left with an empty
agreement to arbitrate devoid of additional terms, and the FAA
does not empower the Court to fill the significant void left by
the unconscionable terms.

A37

## V.  CONCLUSION

For all of these reasons, Defendants' renewed motion to compel arbitration will be denied.  An accompanying Order will be entered.


__December 3, 2014__                    __s/ Jerome B. Simandle__
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge

38

A38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAWN GUIDOTTI, on behalf of herself and other class members similarly situated,<br><br>   Plaintiff,<br><br>  v.<br><br>LEGAL HELPERS DEBT RESOLUTION, L.L.C., et al.,<br><br>   Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>Civil Action<br>No. 11-1219 (JBS/KMW)<br><br>**ORDER** |

This matter comes before the Court by way of Defendant Global Client Solutions, L.L.C.'s and Rocky Mountain Bank and Trust's (collectively, "Defendants") renewed motion to compel arbitration of Plaintiff Dawn Guidotti's (hereinafter, "Plaintiff") claims [Docket Item 155]; and by way of Defendants' motion to strike Plaintiff's certified statement of material facts in opposition to Defendants' motion [Docket Item 164]; and the Court having considered the parties' submissions; and for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS this ___3rd___ day of ___December___, **2014,** hereby

ORDERED that Defendants' motion to strike Plaintiff's certified statement of material facts in opposition to Defendants' motion to compel arbitration [Docket Item 164] shall

be, and hereby is, **GRANTED IN PART** and **DENIED IN PART**; and it is

further

    ORDERED that Defendants' renewed motion to compel

arbitration [Docket Item 155] shall be, and hereby is, **DENIED**.


                              **  s/ Jerome B. Simandle  **
                              JEROME B. SIMANDLE
                              Chief U.S. District Judge

A40

**GREENSPOON MARDER, P.A.**
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
954-491-1120 (phone); 954-343-6958 (facsimile)
Richard W. Epstein, Esq. (Fla. Bar No. 229091)
(Admitted Pro Hac Vice)
Richard.Epstein@gmlaw.com
Meredith H. Leonard, Esq. (Fla. Bar No. 69535)
(Admitted Pro Hac Vice)
Meredith.Leonard@gmlaw.com
Rebecca F. Bratter, Esq. (Fla. Bar No. 0685100)
(Admitted Pro Hac Vice)
Rebecca.Bratter@gmlaw.com

**MORGAN MELHUISH ABRUTYN**
651 W. Mt. Pleasant Avenue, Suite 200
Livingston, N.J. 07039
Tel:(973) 994-2500; Fax:(973) 994-3375
Shaji M. Eapen, Esq.
seapen@morganlawfirm.com

*Counsel for Defendants Global Clients*
*Solutions, LLC and Rocky Mountain*
*Bank and Trust*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| DAWN GUIDOTTI, on behalf of herself and all other class members similarly situated,<br><br>Plaintiffs,<br>-vs-<br><br>LEGAL HELPERS DEBT RESOLUTION, LLC, *et al.*<br><br>Defendants. | Civil Action No.: 1:11-cv-01219–JBS–KMW<br><br>**DOCUMENT E-FILED**<br><br>**NOTICE OF APPEAL** |

A41

In accordance with Fed. R. App. P. 3, notice is hereby given that Global Client Solutions, LLC ("Global") and Rocky Mountain Bank and Trust ("RMBT"), Defendants in the above named case, hereby appeal to the United States Court of Appeals for the Third Circuit from an order denying Global's and RMBT's Motion to Compel Arbitration [Doc.s 155, 155-1 through 155-11], entered in this action on the 3rd day of December, 2014 [Doc.s 173 and 174]. Further, while this action was brought by Plaintiff as a class action, the purported class has not yet been certified.

Respectfully submitted this 31st day of December, 2014.

s/Shaji Eapen, Esq.
**MORGAN MELHUISH ABRUTYN**
651 W. Mt. Pleasant Avenue, Suite 200
Livingston, N.J. 07039
Tel: (973) 994-2500; Fax: (973) 994-3375

**GREENSPOON MARDER, P.A.**
200 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Tel: 954-491-1120; Fax: 954-343-6958

*Counsel for Global and RMBT*

A42

**AFFIDAVIT OF SERVICE**

DOCKET NO.  15-1054

--------------------------------------------------------------------------------X

Guidotti, et al.,

      vs.

Legal Helpers Debt Resolution, L.L.C., et al.

--------------------------------------------------------------------------------X

      I, Elissa Matias, swear under the pain and penalty of perjury,  that according to law and being over the age of 18, upon my oath depose and say that:

      on June 1,2 015

      I served the within Brief and Appendix Volume I of III on Behalf of Appellants Global Client Solutions, LLC and Rocky Mountain Bank and Trust in the above captioned matter upon:

| | |
|---|---|
| Joseph M. Pinto | Anthony J. Fusco, Jr., Esquire |
| Polino and Pinto | Fusco & Macaluso |
| 720 East Main Street | 150 Passaic Avenue |
| Suite 1C | P.O. Box 838 |
| Moorestown, NJ  08057 | Passaic, NJ  07055 |

via **electronic filing and electronic service**. as well as,  **Express Mail** by depositing  **2** copies of same, enclosed in a post-paid, properly addressed wrapper, in an official depository maintained by United States Postal Service.

Unless otherwise noted, copies have been sent to the court on the same date as above for filing via Express Mail.

**Sworn to before me on June 1, 2015**

| | |
|---|---|
| /s/ Robyn Cocho | /s/ Elissa Matias |
| Robyn Cocho | Elissa Matias |
| Notary Public State of New Jersey | |
| No. 2193491 | |
| Commission Expires January 8, 2017 | |

                                    Job # 257515